## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SA&H ALABAMA HOLDINGS, LLC, a Delaware limited liability company and SOUTHERN HVAC CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>     v.<br><br>LAST MINUTE INVESTMENTS B INC. (F/K/A JONES-NUNN, INC.), LAST MINUTE INVESTMENTS A LLC (F/K/A MCCUTCHEON MECHANICAL SERVICES, LLC), and JASON DEWAYNE GERSTMAN,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. _____ |

## COMPLAINT

Plaintiffs SA&H Alabama Holdings, LLC and Southern HVAC Corporation ("Plaintiffs") bring this action for damages and injunctive relief against Defendants Last Minute Investments B Inc. (f/k/a Jones-Nunn, Inc.) ("Jones-Nunn"), Last Minute Investments A LLC (f/k/a McCutcheon Mechanical Services, LLC) ("McCutcheon"), and Jason Dewayne Gerstman ("Gerstman", and together with Jones-Nunn and McCutcheon, the "Selling Parties" or "Defendants").

Following a March 23, 2023 acquisition, Plaintiffs learned that Gerstman and his companies fraudulently induced Plaintiffs to enter into the deal, committed extensive breaches of the Parties' agreements, and covertly collaborated with Plaintiffs' competitor to target key employees in order to steal from and harm Plaintiffs' business.

Before the acquisition closed, Gerstman and his companies actively concealed material facts and made false representations regarding the status of the business, the legacy employees,

and assets being acquired – all of which, if known, would have immediately ended Plaintiffs pursuit of this transaction. Plaintiffs have now learned that Gerstman also secretly worked with a direct competitor, before and after the deal, to target and hire away key employees and funnel internal information – leading to the wholesale theft of the very assets and business Plaintiffs paid the Defendants over $20 million dollars to acquire. Plaintiffs bring this action against the Defendants to redress this nefarious and unlawful conduct.

## INTRODUCTION[1]

1.      In March 2023, Defendants Jason Gerstman and his companies, Jones-Nunn and McCutcheon, entered into an Asset Purchase Agreement with Plaintiffs, whereby Plaintiffs acquired the assets of Gerstman's companies in exchange for paying Gerstman and his companies approximately $21 million (the "Acquisition"). A copy of the Asset Purchase Agreement is attached hereto as **Exhibit A**.

2.      In order to induce Plaintiffs to enter into the Asset Purchase Agreement and to pay the Selling Parties the Purchase Price, the Selling Parties made certain representations and warranties related to the business and assets being acquired, including with respect to the protection, status, and integrity of the Sellers' valuable proprietary and confidential information and trade secrets.

3.      Gerstman and the Selling Parties also represented that there were no attrition risks for Plaintiffs' key managerial employees, who Plaintiffs intended to employ to run the acquired business following the Acquisition.

---

[1] Capitalized terms not otherwise defined herein shall take the meaning defined in the Asset Purchase Agreement attached hereto as Ex. A.

4.      Because of the importance of these key employees, Gerstman secured their agreement to restrictive covenants with Plaintiffs as part of the Acquisition.  Gerstman also entered into his own sale-of-business restrictive covenants in conjunction with the Asset Purchase Agreement.

5.      Following the Acquisition, Plaintiffs' current (and Gerstman's former) managerial employees began breaching their contractual obligations, fiduciary obligations, and other duties to Plaintiffs, including by misappropriating and retaining the confidential information, trade secrets, and other Acquired Assets that Plaintiffs paid Gerstman millions of dollars to acquire only months earlier.

6.      Each of these key managerial employees subsequently separated from Plaintiffs and surreptitiously began working for Plaintiffs' competitor, One Source Heating, Cooling, and Electrical, LLC ("One Source"), in violation of their restrictive covenants and applicable law.

7.      To redress this unlawful conduct, Plaintiffs initiated litigation against one of its former employees, Scott Shoemaker ("Shoemaker"), in the Northern District of Alabama, seeking damages and injunctive relief (the "Alabama Litigation").

8.      Specifically, Plaintiffs sought to enjoin Shoemaker's violation of his Employment Agreement and ongoing retention and misappropriation of Plaintiffs' customer list – one of the key assets the Defendants sold to Plaintiffs as part of the Acquisition, and which Shoemaker took and refused to return to Plaintiffs after resigning to join One Source.

9.      To Plaintiffs' surprise, in advance of a December 2023 Preliminary Injunction Hearing against Shoemaker, Gerstman voluntarily submitted a declaration *in support of Shoemaker's opposition to* Plaintiffs' motion seeking the return of the stolen customer list and enforcement of Shoemaker's Employment Agreement.

10. Remarkably, Gerstman represented under oath that he never implemented or enforced any controls or rules that restricted employees from sharing or retaining the Selling Parties' information, such as the customer list.

11. Gerstman then doubled down and provided live testimony in support of Shoemaker at the Preliminary Injunction hearing. There, Gerstman again represented that the Selling Parties had no strict rules regarding the transfer or retention of valuable information like the customer list that Shoemaker took and retained.

12. Gerstman's sworn statements contradicted multiple representations and warranties that the Selling Parties had freely made in the Asset Purchase Agreement.

13. In short, months after selling this very customer information to Plaintiffs in exchange for millions of dollars, Gerstman testified under oath that he had no information controls in place and allowed his employees to take and retain at will the same information he sold to Plaintiffs.

14. Gerstman's testimony was a naked admission, under oath, that the Selling Parties had falsely warranted that they protected and properly maintained the information Plaintiffs proceeded to acquire. Even worse, Gerstman submitted this testimony in an effort to aid his former employee, who refused to return the very assets the Defendants sold to Plaintiffs while simultaneously working for Plaintiffs' competitor, One Source.

15. Gerstman's sworn testimony exposed the Selling Parties' unequivocal breaches of the Asset Purchase Agreement and liability for the same.

16. The litigation against Shoemaker and One Source has since revealed that Gerstman's nefarious and unlawful conduct extends far beyond his breaches of the Asset Purchase Agreement and his efforts to aid Shoemaker and One Source in the Alabama Litigation.

17.    Specifically, new information revealed that Gerstman had ongoing business communications *before and after* the Acquisition with Shoemaker, Gerald Rollo ("Rollo")—another key employee, and One Source, in violation of Gerstman's legal and contractual obligations (Plaintiffs later amended their complaint in the Alabama Litigation to bring claims against Rollo for violations of his restrictive covenant obligations).

18.    These communications included, but were not limited to, discussions about growing One Source's competitive business and efforts to induce and encourage Rollo and Shoemaker to defect to One Source—all while Shoemaker and Rollo were stealing Plaintiffs' information for future use at One Source.

19.    Gerstman maintained secret communications with leadership at One Source and with his key employees while he simultaneously negotiated the Asset Purchase Agreement and after he sold his business to Plaintiffs —the same business he was actively working to undermine and damage.

20.    Gerstman's affirmative misrepresentations and omissions before entering into the Asset Purchase Agreement, and his subsequent and ongoing contractual violations and collaboration with Plaintiffs' competitor, demonstrate that Gerstman never intended to honor his agreements with Plaintiffs.

21.    Gerstman's unscrupulous motives are confirmed by his own words.  After Shoemaker took and retained Plaintiffs' customer list and received a demand letter from Plaintiffs, Gerstman exchanged messages with Shoemaker making light of Plaintiffs' investigation, and explicitly joking about stealing Plaintiffs' customer list.

22.    Gerstman's unlawful conduct and its fallout has now forced Plaintiffs to spend substantial time and resources litigating against Shoemaker, Rollo, and One Source in order to

secure the return of the stolen assets which Gerstman sold to Plaintiffs. Moreover, Plaintiffs continue to incur significant time and resources enforcing Rollo and Shoemaker's restrictive covenants in relation to their unlawful employment with One Source, which Gerstman actively facilitated. Indeed, after securing Rollo and Shoemaker's Employment Agreements with Plaintiffs as part of the Acquisition, Gerstman almost immediately began interfering with those same agreements, including by inducing each former employee to join One Source.

23.     Before filing this Complaint, Plaintiffs engaged in the Asset Purchase Agreement's indemnification and notice procedure. Plaintiffs also demanded Gerstman's assurances that he had and would continue to comply with his sale-of-business covenants and other obligations to Plaintiffs.

24.     In response, Gerstman offered false assurances and misrepresentations, and categorically denied Plaintiffs' established claims. Tellingly, despite his own sworn testimony confirming the Selling Parties' breaches outlined in this Complaint, Gerstman refuses to acknowledge or accept any liability.

25.     Plaintiffs now bring this action for damages and injunctive relief against the Defendants for their brazen and ongoing violations of the Asset Purchase Agreement, Gerstman's Non-Compete Agreement, and applicable law.

## PARTIES

26.     This is an action for damages and injunctive relief.

27.     Plaintiff, SA&H Alabama Holdings, LLC ("SA&H"), is a limited liability company organized and existing under the laws of the State of Delaware. SA&H's sole member is Plaintiff Southern HVAC Corporation ("Southern"), a corporation incorporated and existing under the laws of the State of Delaware, with a principal place of business in Maitland, Florida.

28.     Defendant Last Minute Investments B Inc. (f/k/a Jones-Nunn, Inc.) is a corporation incorporated and existing under the laws of the State of Alabama, with a principal place of business in Alabama. Upon information and belief, Jones-Nunn's sole shareholder is Gerstman, an individual who is a citizen of Alabama.

29.     Defendant Last Minute Investments A LLC (f/k/a McCutcheon Mechanical Services, LLC) is a limited liability company organized and existing under the laws of the State of Alabama. Upon information and belief, McCutcheon's sole member is Gerstman, an individual who is a citizen of Alabama.

30.     Defendant Jason Dewayne Gerstman is an individual over the age of eighteen (18) who resides in Bremen, Alabama and is a citizen of Alabama.

31.     At all times relevant hereto, Gerstman was the sole owner of Jones-Nunn and McCutcheon and exercised full control over Jones-Nunn and McCutcheon.

## JURISDICTION AND VENUE

32.     This Court has personal jurisdiction over Jones-Nunn, McCutcheon, and Gerstman because the Defendants agreed to submit to the jurisdiction of this Court in the contracts at issue.

33.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000, exclusive of interests and costs, and diversity of citizenship exists between Plaintiffs and Defendants.

34.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(1) under the agreements entered into by Plaintiffs and Defendants, including, but not limited to, the Parties' Asset Purchase Agreement and Gerstman's Non-Compete Agreement, which provide for jurisdiction and venue in "the United States District Court for the District of Delaware."

## FACTUAL ALLEGATIONS

**A.**    **Plaintiffs' Business.**

35.    Plaintiff SA&H's parent, Southern, owns and operates heating and air conditioning, plumbing, electrical and generator service, repair, maintenance and installation companies and businesses throughout the Southeastern, Mid-Atlantic and Midwestern United States.

36.    SA&H is Southern's wholly owned subsidiary.

37.    On March 27, 2023, Plaintiffs entered into an asset purchase agreement with Jones-Nunn, doing business as "Valley Heating & Cooling" ("Valley") and McCutcheon, and Gerstman to acquire Sellers' assets, business and goodwill, and trade names (the "Asset Purchase Agreement").

38.    To protect the Company's confidential information and goodwill, and as part of the sale of the Acquired Assets to the Plaintiffs, on March 27, 2023, ancillary to the Asset Purchase Agreement, Gerstman also entered into a Non-Competition, Non-Solicitation and Confidentiality Agreement  (the "Gerstman Non-Compete Agreement").  A copy of the Gerstman Non-Compete Agreement is attached hereto as **Exhibit B**.

39.    The Asset Purchase Agreement defined "Ancillary Agreements" to include Gerstman's Non-Compete Agreement.

40.    Since the March 27, 2023 Acquisition, Plaintiffs have done business under the trade names "Valley Heating & Cooling" and "McCutcheon Heating and Air."

41.    For the purposes of this Complaint, SA&H and the trade names "Valley Heating & Cooling" and "McCutcheon Heating and Air" are otherwise referred herein as "Plaintiffs".

**B.**     **The Selling Parties' Representations and Obligations Under the Asset Purchase Agreement.**

42.     Pursuant to Article 5 of the Asset Purchase Agreement, the Selling Parties made certain representations and warranties to induce Plaintiffs to enter into and consummate the Asset Purchase Agreement.

43.     Specifically, Article 5 provides that "[i]n order to induce Buyer to enter into this Agreement, the Selling Parties hereby jointly and severally represent and warrant to the Buyer that the statements contained in [Article 5] are true and correct as of the date hereof."  Ex. A, § 5.

44.     Section 5.8 , titled "Absence of Certain Changes or Events," provides, in part:

> Except as set forth on <u>Schedule 5.8</u>, since January 1, 2022, Sellers have conducted the operations of the Business in the ordinary course, consistent with past practice, the Business has not suffered (involuntarily or voluntarily) a Material Adverse Effect, and Sellers have not …
>
> (a) received notice of any event, occurrence, fact, condition, or change that, with or without notice or the passage of time or both, could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect;
>
> …
>
> (i) suffered or received notice of any damage, destruction or loss, or any material interruption of use, of any Acquired Asset (whether or not covered by insurance) to any assets or properties;
>
> …
>
> (o)  entered into any agreement or made any commitment to take any of the types of action described in Sections 5.8(a) through 5.8(n) above; or
>
> (p) without limiting the forgoing, experienced an adverse change, or been advised (whether in writing or orally, directly or indirectly) that an adverse change may occur or be under consideration by the other party, in its relationship with (i) any Material Customer, or (ii) any Material Supplier.

Ex. A, § 5.8(a)(i)(o–p).

45.     The Asset Purchase Agreement defines "Material Adverse Effect" as "any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (i) the business, results of operations, prospects, condition (financial or otherwise) or assets of the Business, (ii) the value of the Acquired Assets, or (iii) the ability of any of the Selling Parties to consummate the transactions contemplated hereby." Ex. A, Exhibit A.

46.     The Asset Purchase Agreement defines "Ordinary Course of Business" to mean "in respect of any Person, the ordinary course of such Person's business, as conducted by such Person in accordance with past practice and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in this Agreement or any Ancillary Agreement." Ex. A, Exhibit A.

47.     Section 5.9(a) of the Asset Purchase Agreement, titled "Title Conveyed; Condition and Sufficiency of Assets," provides as follows:

> Sellers are the sole and exclusive owners of all right, title and interest in and to the Acquired Assets and have good and valid title to, or a valid leasehold interest in, the Acquired Assets, free and clear of Liens except those set forth on Schedule 5.9(a)(i) attached hereto, which, except as set forth on Schedule 5.9(a)(ii), are being released (and shall be released) contemporaneously with Closing.  Sellers have complete and unrestricted power and the unqualified right to sell, assign, transfer and deliver the Acquired Assets to Buyer and, at Closing, Buyer will acquire good and valid title to the Acquired Assets, free and clear of all Liens…

Ex. A, § 5.9(a).

48.     Section 5.9(b) of the Asset Purchase Agreement, provides as follows:

> The Acquired Assets (i) are sufficient for the continued operation of the Business after Closing in substantially the same manner in which it is currently conducted, (ii) constitute all of the assets, properties and property rights necessary to operate the Business after Closing in substantially the same manner in which it is currently conducted, and (iii) include all of the operating assets that generated the results of operations reported in the Annual Financial Statements as of and for the year ended December 31, 2022, and in the Interim Financial Statements.

Ex. A, § 5.9(b).

49.     Section 2.1 of the Asset Purchase Agreement defines "Acquired Assets," in relevant part as follows:

> [A]ll assets (tangible and intangible), properties and other rights of any Seller, including all such assets, properties and rights that are used or held for use by any Seller in connection with the operation of the Business, excluding only the Excluded Assets, such Acquired Assets to include all right, title and interest of each Seller in, to and under the following:
>
> …
>
> > (e) all Contracts of Sellers listed on Schedule 2.1(e), including any customer purchase orders, customer work orders, recurring service or maintenance Contracts with Sellers' customers, and those other Contracts listed thereon, and each other Contract that Buyer, in writing, specifically elects to assume or receive the benefit of after being made aware of such Contract's existence (and the terms thereof) (collectively, the "***Acquired Contracts***");
> >
> > (f) all Software and other Intellectual Property, including (i) all licenses and sublicenses granted or obtained with respect thereto, rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the Laws of all jurisdictions and (ii) all trade names or "d/b/a" names of Sellers, including the trade name "Valley Heating & Cooling" and "McCutcheon Heating & Air Conditioning";
> >
> > (g) all lists, databases and studies (including lists of all prospects, clients and customers of the Business);
> >
> > (h) all claims and rights of every kind relating to the Acquired Assets or the Business, including refunds, causes of action, choses in action, rights of recovery, insurance benefits, rights of set-off, and rights of recoupment (including any such item relating to the payment of Taxes in respect of periods following Closing), other than any of the rights of any Selling Party under this Agreement, any Ancillary Agreement or any other agreement between Buyer and any Selling Party entered into on the Closing Date;
> >
> > …
> >
> > (j) all operating materials, data and business records, employment records of Rehired Employees, sales and advertising materials and related materials relating to the Acquired Assets or the Assumed Liabilities or other matters contemplated by this Agreement;
> >
> > …

(m) all goodwill and other intangible assets related to the Acquired Assets and the Business.

Ex. A, § 2.1(e–h)(j)(m).

50.    The Asset Purchase Agreement defines "Intellectual Property" to include "all trade secrets…customer and supplier lists, pricing and cost information, [ ] business and marketing plans and proposals (to the extent the foregoing qualify under applicable law as trade secrets or protectable confidential information)...all other proprietary rights, and [ ] all copies and tangible embodiments thereof (in whatever form or medium)." Ex. A, Exhibit A.

51.    Section 5.10 of the Asset Purchase Agreement, titled "Intellectual Property; Privacy," provides as follows:

(b) Except as set forth in Schedule 5.10(b), Sellers are the exclusive owners of, or have a valid right to use, all Intellectual Property that is used in or necessary for Sellers to conduct the Business as currently conducted and as proposed to be conducted (the "***Sellers' Intellectual Property***"), in each case, free and clear of all Liens, and all such Sellers' Intellectual Property is either exclusively owned by Sellers or covered by a License In as set forth in Schedule 5.10(c).  All right, title, and interest in and to, and all rights to use, all Sellers' Intellectual Property that are held by Sellers as of immediately before Closing shall, at Closing, transfer, be conveyed to, and vest fully in Buyer, free and clear of all Liens and without triggering any breach, default, right of termination, cancellation, or acceleration, or any requirement to obtain any consent from a third party (in each case, with or without notice, passage of time, or both).

…

(d) Sellers have not sold, licensed, leased or otherwise transferred or granted any interest or rights in or to any portion of the Sellers' Intellectual Property to any third party, except for the licenses (if any) listed on Schedule 5.10(d), none of which grant any third party an exclusive license.

(e) Except as set forth in Schedule 5.10(e) … to the Knowledge of the Selling Parties, no Person is infringing, misappropriating, diluting or violating any Sellers' Intellectual Property owned by Sellers, nor, to the Knowledge of the Selling Parties, has any such infringement, misappropriation, dilution or violation occurred, and no Actions against any Person by Sellers alleging such infringement,

misappropriation, dilution or violation are pending or threatened, nor have Sellers ever initiated, maintained, or threatened any such Actions against any Person.

(f) All Trade Secrets of the Business have been maintained in confidence and protected in accordance with protection procedures that are reasonable under the circumstances and, in any event, are sufficient to maintain any protected or privileged status of such Trade Secrets under any applicable Law.  All past and present employees and independent contractors of, and consultants to, Sellers have entered into agreements with Sellers under which such employee, independent contractor or consultant agrees to (i) protect as confidential and not disclose all confidential information of Sellers to which such employee, independent contractor, or consultant has possession of or access to, and (ii) assign (by way of a present grant of assignment) to Sellers all Intellectual Property created or otherwise developed by such employee, independent contractor or consultant in the course of his or its relationship with Sellers.

…

(i) Sellers have in place commercially reasonable data protection, data security and privacy policies and procedures, which comply with all applicable Laws.  Sellers have been and currently are in compliance with all applicable Laws, contractual privacy obligations, and their internal privacy policies and guidelines relating to the collection, compilation, use, storage, and transfer of Personal Data.  Sellers have not received any written complaints alleging that the Business has been subject to any improper disclosure or misuse of Personal Data or security breach that compromised the security, confidentiality, or integrity of the Personal Data of any Person, and there have been no improper disclosures or misuse of Personal Data or breaches of security that compromised the security, confidentiality, or integrity of the Personal Data of any Person.

Ex. A, § 5.10(b)(d)–(f)(i).

52.     Under the Asset Purchase Agreement, the Selling Parties also made certain representations and warranties regarding employee retention during and after execution of the Asset Purchase Agreement.  Specifically, Section 5.18(d) of the Asset Purchase Agreement provides that, "to the Knowledge of the Selling Parties … no Employee has current plans to terminate his or her employment with any Seller (whether in connection with Closing or otherwise)." Ex. A,§ 5.18(d)(ii).

53.     Section 5.23(b) of the Asset Purchase Agreement provides in relevant part:

Neither any Seller, nor any of their respective officers, directors, employees, or independent contractors, nor any agent or other third party representative acting on behalf of any Seller, has at any time made any unlawful payment or given, offered, promised, or authorized or agreed to give, any money or thing of value, directly or indirectly, to any Government Official or other Person, including any customer or supplier of the Business (or any representative of such customer or supplier … (ii) for the purpose of influencing any act or decision of any Person, inducing any Person to do or omit to do an act in violation of a lawful duty, or inducing any Person to influence the act or decision of any Governmental Entity or other Person in order to obtain or retain business, or direct business to, any Person, (iii) to secure or retain any improper advantage or as part of a "quid pro quo" arrangement, or (iv) in connection with any arrangement that was not (A) fully disclosed to the appropriate representatives of all Persons with an interest in such arrangement and (B) accurately and completely reflected and documented in Sellers' books and records and the Financial Statements.

Ex. A, § 5.23(b).

54.    Other provisions under Section 5.8 relate to the Selling Parties' representations and warranties that they had no reason to believe any event, conduct, or other transaction planned, contemplated, or otherwise under discussion could undermine the integrity of the Acquired Assets, their value, or the Company's ability to continue at its current performance.  *See*, *e.g.*, Ex. A, § 5.8(a)(i)(o–p).

55.    Plaintiffs relied on each of the Selling Parties' representations and warranties when entering into the Asset Purchase Agreement and consummating the transactions contemplated therein, including payment of the Purchase Price to the Selling Parties.

56.    Gerstman and the Selling Parties had a contractual and legal duty to Plaintiffs to do whatever was necessary to ensure that these representations and warranties were accurate and correct.

57.    Section 7.4 of the Asset Purchase Agreement outlines the Selling Parties' non-disparagement and non-interference obligations, stating:

No Selling Party shall take any action that is designed or intended to discourage, or that has the effect of discouraging, any customer, client, supplier, vendor or trade

creditor of the Business from maintaining a business relationship with Buyer following Closing substantially similar to that maintained with Sellers before Closing, or otherwise harming or interfering with such relationship, and, without limiting the foregoing, no Selling Party shall make any statement to any third party or otherwise in public that is intended to disparage or has the effect of disparaging such business relationships or Buyer or the Business.

Ex. A, § 7.4.

58.     Any knowledge of possible risks that would impair the Selling Parties' ability to truthfully make the representations and warranties in the Asset Purchase Agreement, including, but not limited to, misuse of the Acquired Asserts or Intellectual Property, insufficient enforcement of information security controls, or failure to investigate those risks, constitutes a material misrepresentation. Such material misrepresentations would extend to knowledge of the risks related to the Fundamental Representations and Warranties, as defined in the Asset Purchase Agreement, such as Section 5.9. *See* Ex. A, § 8.1.

59.     Section 8.1 of the Asset Purchase Agreement, titled "Survival," provides that "[a]ll representations and warranties in this Agreement and any Ancillary Agreement shall survive the Closing and the consummation of the transactions contemplated hereby and continue in full force and effect for a period of twenty-four (24) months after the Closing Date…" Ex. A, § 8.1.

60.     Section 8.1 provides the representations and warranties set forth under the Fundamental Representations and Warranties survive for six years after the Closing Date. Ex. A, § 8.1; *see also id.,* §§ 5.1, 5.2, 5.3, 5.9(a), 5.12, 5.17, 5.22, 5.23, 5.24, 5.25.

61.     Section 8.2 of the Asset Purchase Agreement sets forth the Selling Parties' indemnification obligations:

The Selling Parties, jointly and severally, shall indemnify, defend and hold harmless Buyer and its Affiliates (the "***Buyer Indemnified Parties***") from and against, and will reimburse the Buyer Indemnified Parties the amount of, any Loss suffered, sustained, incurred, paid or required to be paid by any Buyer Indemnified Party that is based upon, arises out of, results from or is related to:

15

> (a) any inaccuracy in or breach of, or any allegation of any third party that if true, would be an inaccuracy in or breach of, any representation or warranty made by any Selling Party in this Agreement or any Ancillary Agreement;
>
> (b) any breach of or failure of any Selling Party to perform any covenant or agreement to be performed by any Selling Party under this Agreement or any Ancillary Agreement, or any allegation by a third party that, if true, would constitute such a breach or failure…

Ex. A, § 8.2(a)–(b).

62.    Section 8.7(f) of the Asset Purchase Agreement states as follows:

> The right to indemnification or any other remedy based on representations, warranties, covenants or agreements in this Agreement or any agreement, document or certificate delivered hereunder shall not be affected by any investigation conducted at any time, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of, or compliance with, any such representation, warranty, covenant or agreement.

Ex. A, § 8.7(f).

63.    Plaintiffs relied on the Sellers' representations and warranties, to which Gerstman was a party and a signatory, when entering into the Asset Purchase Agreement and consummating the transactions contemplated therein, including payment of the Purchase Price to the Selling Parties.

**C.     As a Condition of the Acquisition, Gerstman Entered into Sale of Business Restrictive Covenants and Also Required his Key Employees to Enter into Restrictive Covenants with Plaintiffs.**

64.    The Asset Purchase Agreement was conditioned on the Selling Parties' agreement that Gerstman and his key employees enter into certain restrictive covenant agreements.

i.   <u>The Gerstman Non-Compete Agreement.</u>

65.     To protect the Company's confidential information and goodwill, and as part of the

sale of the Acquired Assets to the Plaintiffs, on March 27, 2023, ancillary to the Asset Purchase

Agreement, Gerstman entered into the Gerstman Non-Compete Agreement.

66.     The Gerstman Non-Compete Agreement includes the following clauses in its

Preamble:

> WHEREAS, the execution and delivery of this Agreement by the parties is a
> condition to Closing as required by the Asset Purchase Agreement.
>
> WHEREAS, Buyer would not be willing to enter into the Asset Purchase
> Agreement or consummate the transactions contemplated thereunder unless
> [Gerstman] agreed to be bound by the terms of this Agreement.

Ex. B.

67.     In the Gerstman Non-Compete Agreement, Gerstman agreed to be bound by certain

restrictive covenants, including non-competition, which provides that:

> during the period commencing on the Effective Date [March 27, 2023] and ending
> on the fifth (5th) anniversary thereof (the "***Restricted Period***"), such Restricted
> Party shall not. . . engage in, or assist others in engaging in, or preparing to engage
> in, any business that is the same as, similar to or competitive with the Business. . .
> or otherwise provide financial assistance to, render any managerial, marketing or
> other advice or assistance to … any Person that directly or indirectly engages in, or
> preparing to engage in, any business that is the same as, similar to or competitive
> with the Business […]."

Ex. B, § 4(a)(c).

68.     Gerstman acknowledged and agreed that "Business" was defined in the Gerstman

Non-Compete Agreement as follows:

> [T]he business of providing residential and light commercial heating and air
> conditioning services, installation, maintenance, air quality, home insulation, duct
> work, unit repair, and unit replacement services to Persons as conducted and as
> currently proposed to be conducted by [Plaintiffs] and [Gerstman] as of the
> Effective Date.

Ex. B., § 1.

69.     The "Restricted Area" applicable to Section 4 of the Gerstman Non-Compete

Agreement is defined in part as the following:

> the area within an one hundred (100) mile radius of any of (x) 3422 Hooper Lane
> SE, Decatur, Alabama 35603 and/or (y) 1212 Main Street West, Hartselle, Alabama
> 35640 and/or (z) 3481 Main Street, Millbrook, Alabama 36054[.]

Ex. B, § 1.

70.     The Gerstman Non-Compete Agreement includes covenants that restrict

Gerstman's ability to recruit, hire, engage, or otherwise interfere with Plaintiffs' business

relationships, including those with its employees, customers, potential customers, suppliers,

vendors, or other third parties.

71.     Under Section 5 of the Gerstman Non-Compete Agreement, Gerstman agreed not

to:

> hire or engage, or assist any other Person with hiring or engaging, any Covered
> Person who was an employee or consultant to any Group Company or any of their
> or any of their respective Subsidiaries as of the date of this Agreement or at any
> time one (1) year prior to the date of this Agreement[.]

Ex. B, § 5(b).

72.     Under Section 5 of the Gerstman Non-Compete Agreement, Gerstman agreed not

to:

> solicit or induce or attempt to induce, or assist any other Person in soliciting or
> attempting to induce, any customer, supplier or other business relation of any
> member of the Group Companies or any of their respective Subsidiaries (or any
> prospective customer, supplier, or other business relation with which any member
> of any Group Company or any of their respective Subsidiaries has entertained
> discussions regarding a prospective business relationship) and with whom it has
> had material contact (each, a "Business Relation") to cease or refrain from doing
> business with such Group Company or any of its Subsidiaries, or in any way
> interfere with the relationship between any such Business Relation (including,
> without limitation, making any negative statements or communications about any
> Group Company or any of their respective Subsidiaries, equityholders, directors,
> officers or employees), or [ ] enter into any business relationship involving the

Business with any Business Relation or in any way interfere, or assist any other Person in interfering, with the relationship between any Business Relation and any Group Company, any of their respective Subsidiaries or any of their respective Affiliates.

Ex. B, § 5(c)–(d).

73.     Under Section 3 of the Gerstman Non-Compete Agreement, Gerstman agreed to:

keep confidential and not directly or indirectly divulge to anyone, nor use or otherwise appropriate for [his] own benefit, any Confidential Information related to the Business and the Acquired Assets.  The duration of the covenants of each of the Restricted Parties set forth in this Section 3 shall apply for ten (10) years following the Effective Date, to the extent relevant information remains Confidential Information."

Ex. B, § 3.

74.     Under Section 1 of the Gerstman Non-Compete Agreement, Gerstman acknowledged and agreed that "Confidential Information" means:

[A]ll information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the business, products, or research and development of such Person or its Affiliates, including the following: (a) internal business and financial information; (b) identities of, individual requirements of, specific contractual arrangements with, and information about, suppliers, distributors or customers; (c) trade secrets, know-how, analyses, techniques, systems, formulae, research and development information, Records, reports, manuals, drawings, specifications, designs, plans, proposals, technical data, documentation, models, data and databases relating thereto, manufacturing processes and techniques, financial and marketing plans and customer and supplier lists and information; and (d) inventions, innovations, improvements, developments and methods (whether or not patentable).

Ex. B, § 1.

75.     Gerstman agreed that he was required to "notify [Plaintiffs] as early as reasonably practicable prior to disclosure [of Plaintiffs' Confidential Information] to allow Plaintiffs to take appropriate measures to preserve the confidentiality of such information." Ex. B, § 3.

76.     Under Section 6 of the Gerstman Non-Compete Agreement, Gerstman agreed not to:

> directly or indirectly disparage [Plaintiffs] or their respective Subsidiaries or Affiliates or the Business in any way that would adversely affect the goodwill, reputation or business relationships of [Plaintiffs] or their respective Subsidiaries or Affiliates or the Business with the public generally, or with any employees, consultants or Business Relations, provided that a Restricted Party shall not be prevented from providing true testimony to the extent required within any legal proceeding or investigation by a competent Governmental Entity.

Ex. B, § 6.

77.     Under Section 8 of the Gerstman Non-Compete Agreement, Gerstman agreed that any breach or failure to perform under the provisions of the Agreement would cause Plaintiffs irreparable harm.

78.     Under Section 8 of the Gerstman Non-Compete Agreement, Gerstman agreed that any breach or failure to perform under the provisions of the Agreement would entitle Plaintiffs to seek injunctive relief to enforce the Agreement's terms and covenants, among other remedies and damages.

79.     Under Section 10 of the Gerstman Non-Compete Agreement, Gerstman agreed that the restricted period for his covenants under Sections 4-5 of his Non-Compete Agreement would be automatically extended for any period in which he was found to be in violation of such covenants.

        ii.     <u>Restrictive Covenants with Key Managerial Employees.</u>

80.     In order to protect the Acquired Assets, Intellectual Property, and other valuable confidential and proprietary information, trade secrets, and goodwill that Plaintiffs purchased in the Acquisition, Plaintiffs required Gerstman's key managerial employees, who subsequently became Plaintiffs' employees through the Acquisition, to enter into restrictive covenants agreements with Plaintiffs (the "Employment Agreements").  These key employees included Shoemaker and Rollo (the "Former Employees").

81.     The Former Employees' agreement to continue serving as managerial employees for Plaintiffs post-Acquisition were valuable and critical inducements to Plaintiffs entering into the Asset Purchase Agreement, to which Gerstman acknowledged, understood, and agreed.

82.     Gerstman understood the Former Employees' value to the Business he sold to Plaintiffs and agreed to secure each employee's agreement to restrictive covenants in the Employment Agreements as a condition of the Acquisition.

83.     Gerstman has been on notice of the Former Employees' restrictive covenants with Plaintiffs since the Former Employees entered into the Employment Agreements on March 27, 2023.

84.     Gerstman was aware that the Employment Agreements were a precondition to consummating the Acquisition with Plaintiffs, as he specifically negotiated these terms with Plaintiffs.

iii.     Shoemaker and Rollo were Gerstman's Key Managerial Employees at Valley and became Plaintiffs' Key Employees through the Acquisition.

85.     Shoemaker and Rollo served as Valley's managerial employees and the primary leadership for Gerstman before the Acquisition.

86.     Shoemaker's decade long employment tenure commenced in May 2012. Throughout his employment with Valley, Shoemaker reported directly to Gerstman.

87.     As General Manager, Shoemaker had access to all of Valley's valuable information, including, but not limited to, valuable and proprietary information and trade secrets, information regarding Valley's customers, partners, vendors, business methodologies, and other information that created competitive value and advantages for Valley.

88.     Shoemaker was also responsible for running and operating Service Titan at Valley, and subsequently, at Plaintiffs.

89.     Service Titan is a business management software platform that Plaintiffs use for their operations.  Plaintiffs' instance of Service Titan, which also includes the Service Titan information that Plaintiffs purchased from Gerstman, includes information, configurations, methods, and processes that are confidential to Plaintiffs, compiled by Plaintiffs through the investment of significant time and resources, and are not publicly known.

90.     Plaintiffs' specific instance of Service Titan, including the carefully developed non-public information, configurations, methods, and processes contained therein, provides Plaintiffs with a competitive advantage in the marketplace, and would be extremely valuable to Plaintiffs' competitors.

91.     Shoemaker had extensive access to this confidential and proprietary information in and related to Plaintiffs' Service Titan instance that is not publicly known and provides Plaintiffs with a competitive advantage.

92.     The information to which Shoemaker had access at Valley was and is valuable to Plaintiffs in proceeding with the Acquisition and operating the business after the Acquisition.

93.     Before the Acquisition, Shoemaker held a position of trust and confidence at Valley, derived in large part from his access to Valley's most valuable information.

94.     After the Acquisition, Shoemaker became Plaintiffs' General Manager in a nearly identical role, held a position of trust and confidence with Plaintiffs, and owed duties of loyalty and care to Plaintiffs.

95.     Through the Acquisition, Shoemaker received a $50,000 signing bonus as independent consideration to enter his Employment Agreement with Plaintiffs.   Additionally, Shoemaker was eligible for a second $50,000 retention bonus on the first anniversary of his Employment Agreement (March 27, 2024) if he remained with Plaintiffs through that date.

96.     A copy of Shoemaker's Employment Agreement is attached as **Exhibit C**.

97.     Rollo started working at Valley in November 2012 and reported directly to Gerstman during his tenure.

98.     As Sales Manager, Rollo had access to all of Valley's valuable information, including, but not limited to, proprietary information and trade secrets, information regarding Valley's customers, partners, vendors, business methodologies, and other information that created competitive value and advantages for Valley.

99.     The information to which Rollo had access at Valley was acquired by Plaintiffs in the Acquisition, and Rollo continued to have access to such information after the Acquisition through his role as Plaintiffs' Operations Manager.

100.    Before the Acquisition, Rollo held a position of trust and confidence at Valley, derived in large part from his access to Valley's most valuable information.

101.    After the Acquisition, Rollo became Plaintiffs' Operations Manager, held a position of trust and confidence with Plaintiffs, and owed duties of loyalty and care to the Plaintiffs.

102.    A copy of Rollo's Employment Agreement is attached as **Exhibit D**.

103.    Through the Acquisition, Rollo received a $50,000 signing bonus as independent consideration to enter his Employment Agreement with Plaintiffs.  Additionally, Rollo was eligible for a second $50,000 retention bonus on the first anniversary of his Employment Agreement (March 27, 2024) if he remained with the Company through that date.

104.    Under Section 11(d) of the Employment Agreements that were entered into in conjunction with the Asset Purchase Agreement, the Former Employees agreed not to compete with Plaintiffs, as follows:

> During the [one year] Restricted Period, the Employee shall not provide services
> that are the same as or similar to the services that the Employee provided to the

Employer to any business that is the same as, similar to or competitive with the business conducted by the Employer within a fifty (50) mile radius of any of (A) 1212 Main Street West, Hartselle, Alabama 35640 and (B) 3422 Hooper Lane SE, Decatur, Alabama 35603.

Ex. C, § 11(d); Ex. D, § 11(d).

105.    Under Section 11(a) of the Employment Agreements, the Former Employees

agreed to protect Plaintiffs' confidential and trade secret information, promising to:

> [K]eep in strict secrecy and confidence, both during and after the Term [of employment], any and all nonpublic, competitively sensitive information relating to the Employer, its business, or its business plans that are disclosed to the Employee or to which he has access during his employment by the Employer and which the Employer treats as confidential.  The Employee agrees that, both during and after the Term, he will not, without the prior written consent of the Employer, disclose any such confidential information to any third person, partnership, joint venture, company, corporation, or other organization who could make use of such confidential information for business or competitive purposes.

Ex. C, § 11(a); Ex. D, § 11(a).

106.    The Former Employees were required to return Plaintiffs' confidential information

immediately upon separation of their employment or in response to Plaintiffs' request at any time.

107.    Likewise, pursuant to the Employment Agreements, the Former Employees were

bound by non-compete, non-solicitation, and confidentiality restrictions, along with other

covenants and protections prohibiting unlawful competition by the Former Employees and the

taking and use of the assets Defendants sold to Plaintiffs, both during and after their employment

with Plaintiffs.

108.    As Gerstman was aware, the Former Employees became Plaintiffs' managerial

employees after the Acquisition, and owed Plaintiffs fiduciary duties of loyalty and care.

109.    Gerstman had full knowledge of Shoemaker's and Rollo's access to Plaintiffs' most

valuable business information, their respective operational importance to both Valley and to

Plaintiffs, and the respective value that Plaintiffs placed in Shoemaker and Rollo continuing to run the Business when Plaintiffs decided to proceed with the Acquisition.

110. Gerstman understood that Shoemaker and Rollo owed contractual duties to Plaintiffs arising from their Employment Agreements, including their non-competition, non-solicitation, and confidentiality restrictions.

## D. Shoemaker and Rollo Misappropriate Plaintiffs' Information, Surreptitiously Join One Source, and Attempt to Avoid Liability with Gerstman's Help.

111. Just months after the Acquisition closed, both Rollo and Shoemaker separated from Plaintiffs and subsequently began working for Plaintiffs' competitor, One Source.

112. With respect to Shoemaker, Plaintiffs discovered that during his employment, Shoemaker took and retained Plaintiffs' confidential and proprietary information and trade secrets and did not return this information to Plaintiffs upon his resignation or at any time thereafter.

113. Shoemaker took Plaintiffs' customer list, which contains the names, addresses, phone numbers and email addresses, customer referral and lead sources, customer histories (such as purchase and payment history and invoice details), and other customer profile information for Plaintiffs' customers (hereinafter referred to as the "Customer List").

114. In all, the Customer List contains over 15,000 entries with detailed information regarding every customer and recent sales activity for those customer accounts from 2013 to the present.

115. The Customer List contained the Selling Parties' customer information and lists explicitly included in the Acquired Assets that Plaintiffs purchased from the Selling Parties.

116. Although Shoemaker was affirmatively and contractually required to return all of Plaintiffs' information and property upon his separation from Plaintiffs, Shoemaker failed to return

the Customer List, along with other stolen information, after resigning from Plaintiffs, or in response to multiple demands thereafter.

117.    Shoemaker also refused to cease his unlawful employment with One Source, adhere to his Employment Agreement, or otherwise comply with his obligation to Plaintiffs

118.    One Source directly competes with Plaintiffs.

119.    One Source services a large region within Alabama and beyond, including provision of services and sales within the one hundred (100) mile radius of Plaintiffs' offices located at 1212 Main Street West, Hartselle, Alabama 35640 and 3422 Hooper Lane SE, Decatur, Alabama 35603, where Gerstman is prohibited from performing work or services as set forth in his Non-Compete Agreement.

120.    Plaintiffs and One Source actively compete throughout the same service areas, including between Hartselle and Gardendale, Alabama.

121.    At all times relevant hereto, Gerstman knew One Source was a competitor to Plaintiffs and to Gerstman's businesses before the Acquisition.

122.    On November 7, 2023, Plaintiffs commenced a lawsuit against Shoemaker to address Shoemaker's unlawful employment with One Source and to obtain the return of the Customer List and other information acquired from Gerstman in the Acquisition. *See Southern HVAC Corp., et al. v. Michael Scott Shoemaker*, Case No. 5:23-cv-1519-LCB (N.D. Al. 2023).

123.    On November 10, 2023, Plaintiffs filed their Motion for Temporary Restraining Order and Preliminary Injunction against Shoemaker.  Plaintiffs sought the enforcement of their Employment Agreement against Shoemaker and the return of the stolen assets and information Plaintiffs paid Gerstman millions for just months earlier.

124.    Shortly thereafter, Gerstman began publicly aiding Shoemaker in his efforts to escape liability for misappropriation of Plaintiffs' information and violation of his Employment Agreement – all in violation of Gerstman's obligations to Plaintiffs under the Asset Purchase Agreement and the Gerstman Non-Compete Agreement.

125.    On December 8, 2023, in an apparent attempt to aid in Shoemaker's ongoing theft and retention of the Customer List and other Acquired Assets, Gerstman voluntarily submitted a declaration in support of Shoemaker's Opposition to Plaintiffs' Motion for Injunctive Relief, stating as follows:

> Valley did not have a policy that prohibited Shoemaker from using his personal email for work purposes or from sending Valley and McCutcheon information to his personal email address. I did not know that Shoemaker sent Valley and McCutcheon customer lists to his personal email address, but had I known, I would have had no issue because Valley did not have any policy that would have prohibited that.

**Exhibit E**, December 8, 2023, Declaration of Jason Gerstman, ¶¶ 8–9.

126.    Gerstman similarly testified at the December 12, 2023 Hearing on Plaintiffs' Motion for Preliminary Injunction that he had no information safeguards in place, and remarkably, that he had no issue with his former employee, Shoemaker, disseminating and retaining the very customer information that the Selling Parties sold to Plaintiffs.

127.    Gerstman's testimony directly contradicted the Selling Parties' representations and warranties in the Asset Purchase Agreement, including under Section 5.10(f) of the Asset Purchase Agreement, where the Selling Parties warranted that Valley maintained all of its trade secrets and proprietary business information in confidence and under reasonable and sufficient protections.

128.    Gerstman's sworn admissions in the Alabama Litigation also undermine and expose the material misrepresentation that the Selling Parties made in Section 5.9(a) of the Asset Purchase Agreement, where they affirmed the acceptable condition, sufficiency, and exclusive

control over the Acquired Assets, including the Selling Parties' trade secrets and confidential customer information.

129.     Section 8.1 of the Asset Purchase Agreement includes Section 5.9(a) as one of the Asset Purchase Agreement's "Fundamental Representations and Warranties," meaning any indemnity obligation by Gerstman and the Selling Parties that arises from the inaccuracy of those representations and warranties survives up to six (6) years after the Asset Purchase Agreement's Closing Date.

130.     Section 8.7(c) of the Asset Purchase Agreement provides that the Deductible and the Cap do not apply to breaches of the Fundamental Representations and Warranties, nor breaches of the covenants under the Asset Purchase Agreement or Ancillary Agreements, or fraud by the Selling Parties.

131.     Gerstman's sworn declaration and testimony in the Alabama Litigation are admissions that the Selling Parties affirmatively misrepresented information to Plaintiffs including, but not limited to, the status, possession, protection, and handling of the Intellectual Property and Acquired Assets Plaintiffs purchased through the Acquisition.

132.     The Selling Parties made these material misrepresentations and inaccurate statements, including through the representations and warranties of the Asset Purchase Agreement, in order to induce Plaintiffs to enter into the Asset Purchase Agreement and pay the Purchase Price to the Defendants.

133.     Through expedited discovery in the Alabama Litigation, Plaintiffs also learned that, despite false representations by One Source and Rollo, Rollo was in fact working for One Source in violation of his Employment Agreement with Plaintiffs.  Plaintiffs subsequently amended their Complaint against Shoemaker to add claims against One Source and Rollo.

134.     Only as the Alabama Litigation continued would Plaintiffs learn of the depth of Gerstman's wrongdoing and collaboration with One Source, Shoemaker and Rollo.

**E.      The Alabama Litigation Reveals Gerstman's Additional Wrongful Conduct and Breaches.**

135.     Developments in the Alabama Litigation revealed that Gerstman's unlawful conduct spans well beyond his and the Selling Parties' breaches of the representations and warranties of the Asset Purchase Agreement and Gerstman's attempts to aid Shoemaker and One Source in the Alabama Litigation.

136.     In fact, Gerstman actively worked against Plaintiffs both before and after the Acquisition, including by taking affirmative actions to damage and undermine the Business, Acquired Assets, and Intellectual Property that the Defendants sold to Plaintiffs as well as Plaintiffs' contractual rights resulting from the Acquisition.

137.     Although Plaintiffs are continuing their investigation into the scope of Gerstman's ever-expanding actionable conduct, Plaintiffs understand that Gerstman engaged in a variety of unlawful acts, leading up to, and following, the Acquisition, including as detailed below.

    i.    Gerstman Communicated with Rollo and Shoemaker About Their Potential Departure and Enforceability of their Employment Agreements Before the Acquisition Closed.

138.     In early 2023, before the Acquisition, Gerstman communicated with the Former Employees about their likely attrition from Plaintiffs post-Acquisition, as well as the applicability of the Employment Agreements (and non-compete covenants contained therein) that Gerstman had promised Plaintiffs the Former Employees would enter into in conjunction with the Asset Purchase Agreement.

139.     Gerstman understood and acknowledged that Rollo and Shoemaker were not committed to working for Plaintiffs for any prolonged period after the Acquisition closed.  In fact,

Gerstman had discussions with both Rollo and Shoemaker regarding whether they would work for Plaintiffs at all.

140.    Gerstman therefore understood there was a material risk the Former Employees would not continue to work with Plaintiffs, or that they would only remain with Plaintiffs for a limited period of time.

141.    Before the Acquisition, Gerstman had discussions with Rollo and Shoemaker about the enforceability of the same agreements he was negotiating with Plaintiffs.  Gerstman never disclosed these discussions or risks to Plaintiffs.

142.    As the Acquisition drew closer in March 2023, Rollo and Shoemaker again informed Gerstman that they were considering leaving their employment in light of the Acquisition and had serious reservations about continuing to work for Plaintiffs.  Gerstman never disclosed these discussions or risks to Plaintiffs.

143.    Just days before the March 2023 Closing Date, Gerstman communicated with Shoemaker about his potential departure from Plaintiffs post-Acquisition.

144.    On March 23, 2023, four days before the March 27, 2023 Closing Date, Gerstman told Shoemaker that Plaintiffs "are screwed if y'all leave" and also acknowledged that "everything is dependent on you [Shoemaker] and Gerald [Rollo]."

145.    Gerstman and Shoemaker also discussed the scope and enforceability of Shoemaker's future non-compete covenant with Plaintiffs.  Shoemaker's discussion of his post-employment restrictions with Gerstman confirmed Shoemaker's future risk that he might separate from Plaintiffs.  Gerstman never disclosed these discussions or risks to Plaintiffs.

146.    Despite these ongoing communications between Gerstman and Former Employees before the Acquisition closed, the Selling Parties expressly represented and warranted in the Asset

Purchase Agreement, including, but not limited to, pursuant to Section 5.8(a) and 5.9(b),  that they were not aware of any employee attrition risks, while simultaneously committing to require that Shoemaker and Rollo enter into Employment Agreements with Plaintiffs in conjunction with the Asset Purchase Agreement.

147.   The ability to retain the Selling Parties' managerial employees and the requirement that each of these key employees enter into Employment Agreements in conjunction with the Asset Purchase Agreement was a key inducement for Plaintiffs to move forward with the Acquisition and to pay the Purchase Price to the Defendants.

148.   In short, the Selling Parties represented to Plaintiffs that there was no risk of employee attrition with full knowledge that both Shoemaker and Rollo were considering leaving and were uncertain about remaining with Plaintiffs.  The fact that both Shoemaker and Rollo left Plaintiffs for the same competitor, One Source, mere months after these discussions with Gerstman, demonstrates that these undisclosed risks were both material and cognizable before the Acquisition.

ii.   <u>Gerstman Encourages and Induces Shoemaker and Rollo to Leave Plaintiffs for Competitor One Source.</u>

149.   Gerstman was not only aware of the Former Employees likely attrition before the Acquisition, but after the Acquisition, he actively facilitated their departure from Plaintiffs and their subsequent employment.

150.   Specifically, Gerstman induced and encouraged the Former Employees to join Plaintiffs' competitor, One Source.

151.   Gerstman facilitated the Former Employees' defection to One Source and simultaneously communicated with One Source about targeting and hiring the Former Employees (i) while subject to the Asset Purchase Agreement; (ii) while subject to the Gerstman Non-

31

Compete Agreement, including his non-compete, non-solicit, non-interference, and other restrictive covenants; and (iii) with full knowledge of the Former Employees' own Employment Agreements, including non-compete covenants that restricted their employment with One Source.

1.  *Gerstman's Communications and Actions Related to Shoemaker.*

152.    As early as July 2023, Gerstman and Shoemaker were in ongoing discussions about One Source's recruitment of the Former Employees.

153.    On July 21, 2023, Gerstman and Shoemaker communicated about an in person meeting between Rollo, Shoemaker and One Source's owners, Robby Townes and Keith Townes.

154.    Gerstman encouraged Shoemaker to leave for One Source, stating that "You guys [Rollo and Shoemaker] will grow the sh*t out of his [Townes'] company he will be nervous about it at first but once he sees what y'all do it will be game on[.]"

155.    Gerstman then confirmed he had been talking to One Source's owner, Keith Townes, about One Source's competing business and about hiring the Former Employees, noting that "I been talking to Keith and told him it will be a game changer."

156.    Gerstman again confirmed to Shoemaker that he had separate conversations with both Rollo and Townes about the Former Employees leaving Plaintiffs for One Source and "grow[ing] the sh*t out of [Townes'] company."

157.    In July and August 2023, while Gerstman was communicating with Shoemaker about leaving for One Source, Shoemaker violated his fiduciary duties and contractual obligations to Plaintiffs, including by soliciting Plaintiffs' personnel for One Source and by disclosing corporate opportunities and other confidential information belonging to Plaintiffs to One Source.

158.     In fact, Shoemaker began funneling Plaintiffs' internal information and corporate opportunities to One Source's owner Keith Townes within days of Gerstman's discussion about how Shoemaker could grow One Source's business.

159.     For example, on July 17, 2023, while Gerstman was counseling Shoemaker, then Plaintiffs' General Manager, on his exit, Shoemaker diverted a potential sale to One Source, informing One Source's Keith Townes that the potential customer could be a "$800,000 revenue contact" for One Source.  During this same period, Shoemaker solicited Plaintiffs' personnel on behalf of One Source and communicated with and coordinated meetings with the Former Employees and One Source.

160.     In July 2023, while encouraging Shoemaker's defection to One Source, Gerstman communicated with Shoemaker regarding One Source's struggles with properly implementing and utilizing Service Titan.

161.     On July 21, 2023, Shoemaker noted that "I can set up service titan that he [One Source's Keith Townes] pays for but don't use", and Gerstman responded by confirming that doing so "will be huge for them[.]"

162.     Gerstman specifically discussed how valuable Shoemaker could be to One Source by implementing and operating Service Titan for Plaintiffs' competitor.

163.     Access to and knowledge of Plaintiffs' instance of Service Titan, including understanding how to implement, operate, and leverage the platform, would be extremely valuable to One Source, Plaintiffs' competitor, particularly given One Source's apparent past difficulties with implementing and using Service Titan successfully, as Plaintiffs have done through a significant investment of time and resources.

164.    After discussing with Gerstman how Shoemaker could implement Service Titan at One Source and accordingly, grow One Source's business, Shoemaker promptly put this wrongful plan into action.

165.    Discovery in the Alabama Litigation demonstrated that following discussions with Gerstman about implementing Service Titan at One Source, Shoemaker began stealing the necessary information and building blocks to do so from Plaintiffs.

166.    For example, leading up to his resignation, Shoemaker took Plaintiffs' confidential price book used in conjunction with Plaintiffs' Service Titan instance (the "Price Book").

167.    Plaintiffs' Price Book is a detailed document that Plaintiffs compiled by investing significant time and resources, configured precisely for direct upload into the Service Titan platform.

168.    Shoemaker took the Price Book while Gerstman was communicating about implementing and operating Service Titan at One Source.  Shoemaker sent this information to One Source on October 2, 2023, his first official day of employment.

169.    Shoemaker then proceeded to disclose and use Plaintiffs' Service Titan information, setup, and configurations upon joining One Source—all of which are proprietary and confidential to Plaintiffs.

170.    In One Source emails, Shoemaker openly references that he is configuring Service Titan to mirror Plaintiffs' confidential and proprietary Service Titan instance and processes.

171.    One Source confirmed that they were relying entirely on Shoemaker to improve their operations by implementing and running One Source's instance of Service Titan—all through Service Titan information he stole from Plaintiffs. *See, e.g.*, Transcript of Preliminary Injunction

Hearing, p. 142:19–22, *Southern HVAC Corp., et al. v. Michael Scott Shoemaker*, Case No. 5:23-cv-1519-LCB (N.D. Al. 2023), ECF No. 30.

172. At the December 12, 2023 Hearing, which Gerstman attended, One Source's Robby Townes testified as follows: "Q: And, so, whenever there is a problem, whenever any issue comes up with a job, whenever anything with Service Titan is raised, they are going to ask Mr. Shoemaker, aren't they? A: Correct.") (One Source's Townes confirming that Shoemaker is One Source's Service Titan "expert"). *Id.*

173. Gerstman's statements that Shoemaker would prove invaluable by setting up and operating Service Titan at One Source were proven accurate, and came to fruition.

174. Gerstman actively facilitated Shoemaker's unlawful defection to One Source and is responsible for the obvious result that Shoemaker would violate his contractual and legal obligations to Plaintiffs.

175. Gerstman's encouragement and inducement of his former key employee, Shoemaker, to depart Plaintiffs for a competitor, created the obvious risk that Shoemaker would take and use Plaintiffs' valuable confidential information and trade secrets for One Source's benefit including in relation to Service Titan, recruit other employees away from Plaintiffs, and create the expensive and rigorous process that Plaintiffs were forced to undertake by prosecuting the Alabama Litigation against Shoemaker and One Source. That is exactly what happened.

          2.     *Gerstman's Communications and Actions Related to Rollo.*

176. Gerstman separately took an active role in communicating with and inducing Rollo to join One Source.

177. In July 2023, Gerstman communicated with Rollo about leaving Plaintiffs for One Source.

178.     In July 2023, Gerstman informed Shoemaker that he was collaborating on a shared narrative with Rollo to deflect any potential scrutiny or action by Plaintiffs based on the Former Employees' planned departure to One Source.

179.     On July 21, 2023, Gerstman told Shoemaker, "Hell I had Gerald coach me on what he wants me to say to them [Plaintiffs] if they call me we are throwing middle management under the bus."  Thus, Gerstman was an active participant in the Former Employees' efforts to avoid detection and their contractual obligations to Plaintiffs.  Indeed, according to his text messages, Gerstman worked with Shoemaker and Rollo on their cover stories.

180.     Plaintiffs learned in the Alabama Litigation that One Source's scheme in hiring Rollo was to purportedly use Rollo to open a new competing location within Plaintiffs' territory in Cullman, Alabama.

181.     While Gerstman communicated with One Source about how Rollo would be a "game changer" for their business, One Source was planning to use Rollo to expand its territory to further compete with Plaintiffs.

182.     Likewise, while Gerstman was actively communicating with Rollo about working for One Source, Rollo began stealing and stockpiling Plaintiffs' confidential information and trade secrets—the same information that Defendants sold to Plaintiffs months earlier.

183.     For example, on July 27, 2023, August 3, 2023, and August 7, 2023—the same day Rollo's employment with Plaintiffs ended, Rollo forwarded multiple of Plaintiffs' Job Status Reports ("Job Status Reports") from his Valley email alias to his personal email address.

184.     Rollo began stealing this information from Plaintiffs just days after Gerstman confirmed he was in active discussions with both Rollo and One Source about Rollo joining One Source and growing its business.

185.    Plaintiffs' Job Status Reports contain the names, install dates, contact information, work performed, invoice numbers and other information regarding customers and their orders from 2013 through August 2023, including customers located in the Cullman, Alabama area.

186.    The Jobs Status Reports, which Rollo misappropriated, are similar to the Customer List Shoemaker took and refused to return to Plaintiffs.

187.    Pursuant to the Asset Purchase Agreement, the Defendants sold the information contained in the Job Status Reports and the Customer Lists to Plaintiffs for millions of dollars.

188.    Following Gerstman's (i) encouragement and inducement of the Former Employees separation from Plaintiff and (ii) his ongoing, active collaboration with competitor One Source, Rollo and Shoemaker began working for One Source in violation of their Employment Agreements.

189.    Gerstman induced and assisted with the Former Employees' defection to One Source while Gerstman remained subject to the Asset Purchase Agreement and the Gerstman Non-Compete Agreement, which include non-competition and employee non-solicitation covenants.

190.    Gerstman also encouraged and induced the Former Employees to join One Source with full knowledge that Shoemaker and Rollo were Plaintiffs' managerial employees and owed Plaintiffs fiduciary duties of loyalty and care.

191.    Gerstman induced each of Rollo and Shoemaker to breach their fiduciary duties to Plaintiffs, including in relation to actions each of the Former Employees took to benefit themselves and One Source.

192.    Gerstman induced each of the Former Employees to defect for One Source with full knowledge of their access to, and strong likelihood that each would use and disclose at One Source,

Plaintiffs' confidential and proprietary information and trade secrets, including the Acquired Assets and Intellectual Property the Defendants sold to Plaintiffs.

193.    Furthermore, Gerstman encouraged and induced the Former Employees to join One Source with full knowledge of the Former Employees' Employment Agreements, and the non-compete, non-disclosure, non-solicit, and other obligations and covenants therein.

194.    Following Plaintiffs' October 2023 demands that the Former Employees cease and desist from their unlawful conduct, Gerstman continued to collaborate with Shoemaker and Rollo.

195.    For example, following Plaintiffs' October 2023 demands, Gerstman continued disparaging Plaintiffs and feeding Shoemaker internal updates on the status of Plaintiffs' investigation.

196.    In early October 2023, while Shoemaker misappropriated, possessed, and refused to return the stolen Customer List, the Price Book, and other information belonging to Plaintiffs, and after Shoemaker received Plaintiffs' written demand letter, he and Gerstman joked about stealing Plaintiffs' information.

197.    Specifically, on October 10, 2023, Gerstman and Shoemaker had the following written exchange regarding Plaintiffs' demand letters and investigation of the Former Employees:

**Gerstman:**   Gerald [Rollo] told me southern sent letters out y'all wasn't kidding how paranoid they are

**Shoemaker:**   I like it there. Lot of work ahead but at least they're not Granger lol

**Gerstman:**   Eli told me that had 4 guys digging thru you and Gerald computer trying to find something I bet they are worried y'all downloaded the customer base or something […]

**Gerstman:**   Idiots

**Shoemaker:**   Idiots

198.   During the above exchange, while Gerstman specifically referenced theft of Plaintiffs' "customer database," poked fun at Plaintiffs' attempts to protect their property and enforce their contractual rights, and otherwise disparaged Plaintiffs, Shoemaker remained in possession of and refused to return the Customer List and other purloined information belonging to Plaintiffs – including the Acquired Assets Gerstman and his companies sold to Plaintiffs.

           iii.   <u>Gerstman Communicates and Collaborates with One Source Leadership about Hiring Rollo and Shoemaker and Growing One Source's Competing Business.</u>

199.   While he was communicating with the Former Employees about leaving for One Source, Gerstman was simultaneously collaborating with One Source's leadership about growing its competitive business, including through the hiring of Plaintiffs' Former Employees.

200.   In fact, Gerstman's own text messages confirm that he was specifically communicating with, and encouraging One Source, to solicit and hire away Rollo and Shoemaker from Plaintiffs.

201.   For example, on July 21, 2023, Gerstman confirmed to Shoemaker that he had been talking to One Source's Keith Townes about hiring the Former Employees.

202.   A week later, on July 28, 2023, Gerstman communicated with Shoemaker about leaving for One Source and confirmed that "Keith [Townes] and I talk all the time."

203.   As the main selling point for One Source's hiring of Shoemaker, Gerstman communicated with One Source about Shoemaker's knowledge of the confidential and internal assets and information Gerstman sold to Plaintiffs.

204.   Gerstman actively encouraged One Source to recruit and hire Rollo and Shoemaker, notwithstanding the obvious risk that the Former Employees would use and disclose Plaintiffs'

information, and that their employment with One Source would violate the Employment Agreements with Plaintiffs.

205.    Despite the Selling Parties' representations and warranties including, but not limited to, those covered in Sections 5.8(a) and 5.9(b) of the Asset Purchase Agreement, and Gerstman's obligations under his Non-Compete Agreement, Gerstman expressly described conversations with Townes to Shoemaker where he persuaded Townes as to the transformative value One Source would achieve by hiring Shoemaker and Rollo.

206.    Following Gerstman's collaboration with One Source on which of Plaintiffs' key employees to target and hire away, both Shoemaker and Rollo began working for One Source in violation of their Employment Agreements.

207.    Gerstman attempted to conceal and never disclosed to Plaintiffs about his ongoing dialogue with One Source.

208.    Gerstman's communications with, and counseling and assistance to, One Source, including by funneling information to One Source about Plaintiffs' key employees and how One Source could utilize these employees, constitute plain violations of the Gerstman Non-Compete Agreement, including Gerstman's covenants not to compete with Plaintiffs and not to solicit Plaintiffs' personnel.

        iv.    <u>Gerstman Openly Disparages Plaintiffs in Violation of His Agreements and to Induce Rollo and Shoemaker to Leave their Employment.</u>

209.    Gerstman openly disparaged Plaintiffs in his communications with the Former Employees.

210.    From June through at least September 2023, Gerstman sent Shoemaker messages undermining Plaintiffs' business status and leadership.

211.    In text messages to Shoemaker, Gerstman criticized Plaintiffs' management of other HVAC companies, endorsed or specifically offered criticisms of individual managers, and credited outside gossip to Shoemaker that was critical of Plaintiffs.

212.    After Plaintiffs began sending Shoemaker demands regarding his contractual violations, and during the early weeks of the Alabama Litigation, Gerstman sent messages to Shoemaker that discredited Plaintiffs and their efforts to protect their legal rights.

**F.**    **Gerstman Dishonestly Responds to Plaintiffs Indemnification Notice and Request for Assurances.**

213.    On February 8, 2024, Plaintiffs, in compliance with the requirements under the Asset Purchase Agreement, sent Gerstman a Notice of Claim/Indemnification (the "Notice Letter"), invoking the Indemnity provisions at Article 8 of the Asset Purchase Agreement and its other related terms.  A copy of the Notice Letter is attached hereto as **Exhibit F**.

214.    The Notice Letter confirmed that Gerstman's sworn admissions in the Alabama Litigation directly contradicted and undermined the Selling Parties' representations and warranties in the Asset Purchase Agreement.

215.    The Notice Letter also explained that Plaintiffs were entitled to indemnification under the applicable provisions of Article 8 of the Asset Purchase Agreement because, *inter alia*, Gerstman's sworn testimony contradicted the Selling Parties' representations and warranties in the Asset Purchase Agreement related to the protection, status, and possession of the Acquired Assets sold to Plaintiffs.

216.    At this juncture, Plaintiffs were unaware of the expanded scope of Gerstman's prior and ongoing breaches and wrongdoing.

217.    The Notice Letter separately demanded assurances that Gerstman had complied and would maintain compliance with the Gerstman Non-Compete, and would not misuse,

misappropriate, or otherwise disclose Plaintiffs' information in violation of Gerstman's confidentiality obligations to Plaintiffs.

218.    On February 20, 2024, Gerstman, through counsel, responded to Plaintiffs' demand for assurances set forth in the Notice Letter (the "February 20, 2024 Letter").

219.    In the February 20, 2024 Letter, Gerstman denied any breach and falsely represented that he had complied with the Non-Compete Agreement purportedly because he has "an ongoing relationship with Southern and desire [sic] for Southern to succeed" and, as such, has "no intention of taking any actions that are anticompetitive as to Southern." This statement was a bald-faced lie.

220.    On February 23, 2024, Gerstman, through counsel, responded to Plaintiffs' Notice Letter (the "February 23, 2024 Letter").

221.    In the February 23, 2024 Letter, Gerstman feigned ignorance as to what conduct constituted a breach of the Asset Purchase Agreement, despite Gerstman's full knowledge of the Selling Parties' material misrepresentations and omissions relating to the Acquired Assets and employee attrition risks.  Gerstman also issued this written response despite his full knowledge of his additional wrongdoing and breaches related to One Source and the Former Employees, which Plaintiffs were yet to uncover.

222.    On June 21, 2024, following developments in the Alabama Litigation, Shoemaker produced extensive communications that either contained or referenced communications between Gerstman, Shoemaker, Rollo, and One Source between January 2023 and November 2023.

223.    On July 16, 2024, Plaintiffs sent Gerstman a Second Notice of Claim and Demand for Assurances (the "Second Notice Letter").  A copy of the Second Notice Letter is attached hereto as **Exhibit G**.

224.    The Second Notice Letter summarized Gerstman's extensive breaches of the Asset Purchase Agreement, including in relation to the representations and warranties, and Gerstman's numerous breaches of the Gerstman Non-Compete Agreement.

225.    The Second Notice Letter noted that Gerstman interfered with Plaintiffs' contractual rights, including the Employment Agreements with the Former Employees.

226.    On July 22, 2024, Gerstman, through counsel, responded to Plaintiffs' demand for assurances related to Gerstman's compliance with the Gerstman Non-Compete Agreement.

227.    Despite Gerstman's prior representations that he had and would continue to comply with the Gerstman Non-Compete Agreement, Gerstman's July 22, 2024 response no longer included his categorical denial of misconduct.  Instead, Gerstman switched tenses, only providing assurances that Gerstman *would* comply with his obligations going forward. *Compare* February 20, 2024 Letter ("[M]y clients respond as follows: (i) they are not engaging in, *and have not engaged in*, conduct that violates the Non-Compete Agreement … they remain in compliance with the Non-Compete Agreement") and July 22, 2024 Letter ("Mr. Gerstman hereby confirms … that he *will not be* engaging in any conduct that violates the parties' agreements (including the non-compete) in any way, and he voluntarily agrees *to avoid* any contact or other collaborations with his former employees or One Source…") (emphasis added).

228.    On July 31, 2024, Gerstman, through counsel, served his formal response to the Second Notice Letter (the "July 31, 2024 Letter").

229.    Gerstman's July 31, 2024 Letter once again categorically denied any wrongdoing or breach and asserted virtually the same unavailing positions Gerstman previously advanced.

230.    Gerstman also remarkably claimed that he had no evidence that Shoemaker had taken and retained the Customer List, despite: (i) voluntarily submitting a declaration in support

of Shoemaker's Opposition to Plaintiffs' Motion for Injunctive Relief specifically addressing the Customer List; and (ii) appearing in person and testifying at the Preliminary Injunction Hearing relating to Shoemaker's theft and retention of this very Customer List.  It is this sort of bad faith response that Gerstman apparently intends to rely upon in light of his established breaches.

231.   Gerstman's July 31, 2024 Letter admits, twice, that Gerstman knew Rollo and Shoemaker were important assets to the Plaintiffs' transition following the Acquisition and that they required encouragement to remain with the Company.

232.   Gerstman's July 31, 2024 Letter also directly admits that the Former Employees were attrition risks on or before the Acquisition, which confirms the Selling Parties' additional misrepresentations and breaches of the Asset Purchase Agreement, including Sections 5.8, 5.9, and 5.18(d).

233.   Gerstman's categorical denial in the July 31, 2024 Letter that he facilitated One Source's hiring of the Former Employees and the Former Employees joining One Source is directly contradicted by Gerstman's own written communications and evidence produced by Shoemaker in the Alabama Litigation.

234.   Gerstman's July 31, 2024 Letter does admit for the first time Gerstman's ongoing relationship with One Source and its principal, Keith Townes.

235.   Gerstman's July 31, 2024 Letter knowingly and intentionally denies facts in communications that Gerstman clearly reviewed in preparing that letter.  Gerstman's denials are more than an impasse in the process required under the Parties' Notice Obligations—he rejects the process altogether, which is itself actionable conduct under the Asset Purchase Agreement.

44

236.     Following Gerstman's response to the Second Notice, the Parties conferred in accordance with the procedure contemplated under the Asset Purchase Agreement, but were unable to resolve the disputed issues.

237.     Gerstman's denial of Plaintiffs' claims and entitlement to indemnification under the Asset Purchase Agreement, which are confirmed by Gerstman's own contemporaneous communications and sworn testimony, signal that Gerstman has not and will not engage in the indemnification process in good faith, and further, that Gerstman will refuse to acknowledge his and the Selling Parties' established liability to Plaintiffs without court intervention.

**G.      The Selling Parties Breached the Asset Purchase Agreement and Gerstman Violated His Non-Compete Agreement and Applicable Law, Causing Plaintiffs to Sustain Significant and Mounting Damages.**

i.     Defendants' Breaches and Unlawful Conduct.

238.     As set forth in this Complaint, the Selling Parties breached the Asset Purchase Agreement.

239.     In order to induce Plaintiffs to enter into the Asset Purchase Agreement and pay the Purchase Price, the Selling Parties made certain representations and warranties under Article 5 of the Asset Purchase Agreement. *See* Ex. A, Art. 5.

240.     The Selling Parties breached the Asset Purchase Agreement by making contemporaneous misrepresentations before and during execution of the Asset Purchase Agreement.  These violations, willful omissions, and misrepresentations include, but are not limited to, failing to reveal possible risks that key managerial employees with the highest level of access to the Acquired Assets would leave their employment with the Plaintiffs or had discussed leaving their employment with the Selling Parties, in the weeks, or in some cases days, before the Closing Date. Ex. A, §§  5.18(d)(ii); 5.8; 5.23(b).

241.    Following the Closing Date, Plaintiffs learned that the Former Employees each considered leaving their employment and planned to leave their employment in connection to and in relation to the Acquisition, and affirmatively discussed the same with Gerstman in the weeks and days leading up to the Acquisition.

242.    Gerstman had knowledge of such risks with respect to each of the Former Employees.

243.    Gerstman explicitly discussed both Rollo and Shoemaker's apprehension at remaining with Plaintiffs' post-Acquisition, as well as the likelihood that either of the Former Employees' would leave employment with Plaintiffs.

244.    The Selling Parties never disclosed to the Plaintiffs these known attrition risks with respect to Shoemaker and Rollo, and instead affirmatively represented to Plaintiffs there were no such risks.

245.    The Selling Parties also breached the Asset Purchase Agreement by making contemporaneous misrepresentations and omitting and withholding material information related to the integrity, ownership, possession, protection, and transfer of the Sellers' Intellectual Property and Acquired Assets, including the trade secrets, customer lists and customer information, and the goodwill of the Business acquired by Plaintiffs.  *See* Ex. A, §§ 5.8(a)-(b), (d)-(g), (i) (m)-(n); 5.9(a)-(b); 5.10.

246.    Following the Closing Date, Plaintiffs learned that the Selling Parties' employees, including Shoemaker, disclosed, transferred, and otherwise jeopardized the integrity and the value of the Acquired Assets and Intellectual Property acquired by the Plaintiffs before the Acquisition.

247.    Further, Gerstman subsequently testified under oath that the Selling Parties had no strict rules, information controls, or procedures to protect the Acquired Assets and Intellectual

Property acquired by the Plaintiffs, and, implicitly or otherwise, authorized Shoemaker to take, disseminate, and retain the Acquired Assets and Intellectual Property that the Plaintiffs purchased through the Acquisition.

248.    Specifically, in a December 8, 2023 declaration and December 12, 2023 sworn testimony, Gerstman directly contradicted the Selling Parties' representations and warranties under the Asset Purchase Agreement related to the Acquired Assets, including by stating (i) that the Selling Parties had no strict information controls or rules in place, (ii) that Gerstman was unaware that his former employee, Shoemaker, had taken and retained the customer information Gerstman sold to Plaintiffs, and (iii) that Gerstman had no problem with his former employee disseminating and retaining this information.

249.    The Selling Parties' misrepresentations, and willful omissions belie the Selling Parties' representations and warranties, including, but not limited to, those outlined in Sections 5.18(d)(ii), 5.8(a–b)(i)(m–n), 5.9(a–b), 5.10(b)(d)–(f)(i), 5.23 of the Asset Purchase Agreement, and constitute breaches of the same by the Selling Parties.

250.    During the Restricted Period, Gerstman breached his Non-Compete Agreement by rendering managerial, marketing, business and/or other advice and otherwise assisting One Source, Plaintiffs' competitor. *See* Ex. B, §§ 1, 4(a).

251.    Gerstman's advice and counsel to One Source regarding how to grow its competitive business, and related communications regarding hiring away Plaintiffs' Former Employees, constitute breaches of Gerstman's Non-Compete Agreement during the Restricted Period.

252.     During the Restricted Period, Gerstman breached his Non-Compete Agreement by aiding, assisting, and otherwise counseling Shoemaker and One Source in relation to the Alabama Litigation against Plaintiffs. Ex. B, §§ 1, 4(a), 5(b)-(d).

253.     During the Restricted Period, Gerstman breached his Non-Compete Agreement by assisting, advising, and rendering advice to the Former Employees regarding how they could work with Plaintiffs' competitor, One Source, to operate and grow One Source's competing business. Ex. B, §§ 1, 4(a); 5(b)-(d).

254.     During the Restricted Period, Gerstman breached the Gerstman Non-Compete Agreement by directly or indirectly inducing or attempting to induce each of the Former Employees to leave their employment with Plaintiffs and/or by otherwise interfering with the Former Employees' employment with Plaintiffs. Ex. B, §§ 1, 5(b)-(d).

255.     During the Restricted Period, Gerstman breached his Non-Compete Agreement by directly or indirectly inducing or attempting to induce each of the Former Employees to begin working for and providing services to One Source, Plaintiffs' competitor. *Id.*

256.     During the Restricted Period, Gerstman breached his Non-Compete Agreement by disclosing to One Source non-public, internal information about the Former Employees and the Business and Acquired Assets the Defendants sold to Plaintiffs. Ex. B, §§ 1, 3, 4(a).

257.     During the Restricted Period, Gerstman breached his Non-Compete Agreement by directly or indirectly disparaging Plaintiffs, their employees, directors, officers, and affiliates, and the Business (as defined under the Non-Compete Agreement and the Asset Purchase Agreement) in a way that would and did adversely affect the relationships between Plaintiffs and the Former Employees.  Ex. B, §§ 5(b)-(d); (6).

258.     During the Restricted Period, Gerstman breached his Non-Compete Agreement by failing to notify Plaintiffs regarding the disclosure of Plaintiffs' confidential information, including the Acquired Assets and Intellectual Property acquired by Plaintiffs from Gerstman pursuant to the Asset Purchase Agreement. Ex. B, § 3.

259.     Gerstman intentionally and unjustifiably interfered with Plaintiffs' Employment Agreements with the Former Employees.

260.     Pursuant to and in conjunction with the Asset Purchase Agreement, Gerstman agreed to have his key managerial employees, Shoemaker and Rollo, enter into the Employment Agreements with Plaintiffs.

261.     Gerstman was aware of the Former Employees' Employment Agreements.

262.     Gerstman induced the Former Employees to violate their Employment Agreements by leaving employment with Plaintiffs and joining One Source.

263.     Gerstman induced the former employees to violate their Employment Agreements by assisting the Former Employees in a scheme to circumvent the requirements and obligations under the Employment Agreements.

> ii.     <u>The Defendants' Unlawful Conduct and Breaches have Harmed and Continue to Harm Plaintiffs.</u>

264.     To date, the harm to Plaintiffs caused by the Defendants includes tangible legal costs such as the costs of Plaintiffs' investigations, enforcement, forensic search, removal, and return of Plaintiffs' information and the Acquired Assets from Shoemaker, Rollo and One Source, the cost of the Alabama Litigation, Plaintiffs' costs in relation to the Indemnification Notices, the costs of negotiating the Gerstman Non-Compete Agreement, the Shoemaker Non-Compete Agreement, and the Asset Purchase Agreement, all of which Defendants' conduct severely devalued.

265.   To date, the harm to Plaintiffs caused by Defendants includes the diminution of value of Plaintiffs' Acquired Assets, Intellectual Property, goodwill, and of the Business, for which Plaintiffs paid the Selling Parties more than $20 million dollars to acquire, and of Plaintiffs' competitive advantage in the market where it competes, caused in significant part by Gerstman's collaboration in the scheme to denude Plaintiffs of key employees, information, customers, and operational continuity, and his open disparagement of Plaintiffs and their employees.

266.   To date, Gerstman's harm to Plaintiffs includes the loss of the value to its intellectual property and confidential information, including its trade secrets, operational expertise, and customer information, that the Former Employees stole with Gerstman's support, encouragement, and collaboration.

267.   To date, Gerstman's harm to Plaintiffs includes the loss of key employees following Gerstman's assistance in recruiting them to One Source, Plaintiffs' direct competitor.  These damages include the costs of employee retention and hiring, including, efforts to retain current employees, lost investment in the Former Employees and their other recruits, and expenses.

268.   In sum, and based on information currently known to Plaintiffs, as a result of the Selling Parties wrongful conduct and breaches of the Asset Purchase Agreement, and of Gerstman's unlawful conduct, breaches of the Asset Purchase Agreement, the Gerstman Non-Compete Agreement, and applicable law, the Defendants have harmed and damaged, and will continue to harm and damage, Plaintiffs, including, but not limited to, the loss of the consideration paid to Gerstman for entering into the Gerstman Non-Compete Agreement and to the Selling Parties for entering into the Asset Purchase Agreement; any other compensation under the Asset Purchase Agreement; loss of and damage to Plaintiffs' valuable and confidential information, Intellectual Property, Acquired Assets, goodwill, and the Business; damage to Plaintiffs'

relationships with its key employees; loss of use of its key employees for Company-related purposes; Plaintiffs' costs associated with procuring, producing, developing, and protecting its valuable information; the costs of this litigation and the Alabama Litigation; costs of seeking and obtaining Indemnification from the Selling Parties including in bringing this lawsuit; other damages, costs, and Losses Plaintiffs have incurred and are entitled to under the Asset Purchase Agreement, the Gerstman Non-Compete, and applicable law, and other costs and damages to be proven at trial, and along with other irreparable harm that cannot be remedied by monetary damages alone.

269.     Under Section 8.2 of the Asset Purchase Agreement, Gerstman and the Selling Parties agreed as follows:

> The Selling Parties, jointly and severally, shall indemnify, defend, and hold harmless Buyer and its Affiliates (the "Buyer Indemnified Parties") from and against, and will reimburse the Buyer Indemnified Parties the amount of, any Loss suffered, sustained, incurred, paid or required to be paid by any Buyer Indemnified Party that is based upon, arises out of, results from, or is related to:
> (a) any inaccuracy in or breach of, or any allegation of any third party that if true, would be an inaccuracy in or breach of, any representation or warranty made by any Selling Party in this Agreement or any Ancillary Agreement;
> (b) any breach of or failure of any Selling Party to perform any covenant or agreement to be performed by any Selling Party under this Agreement or any Ancillary Agreement, or any allegation by a third party that, if true, would constitute such a breach or failure…

Ex. A, § 8.2(a)-(b).

270.     Under the Asset Purchase Agreement, "Loss" or "Losses" means "any claim, expense, damage, liability, obligation, deficiency, penalty, fine, assessment, cost (including any opportunity cost) or loss (including attorney's fees and other costs and expenses incident to, and amounts paid or required to be paid in settlement of, any Action, including Actions to enforce any indemnity obligation), whether or not involving a Third Party Claim." Ex. A, Exhibit A.

271.     Under the Asset Purchase Agreement and the Ancillary Agreements, including the Gerstman Non-Compete Agreement, the Defendants are liable to the Plaintiffs for, and must indemnify the Plaintiffs for, all Losses based upon, arising out of, resulting from, or relating to the Defendants' breaches and violations of the Asset Purchase Agreement and the Gerstman Non-Compete Agreement.

272.     In addition to the Selling Parties' liability to Plaintiffs for all Losses under the Asset Purchase Agreement and the Ancillary Agreements, Gerstman is liable to Plaintiffs for all costs and expenses related to Gerstman's breaches of the Gerstman Non-Compete Agreement and Plaintiffs' enforcement of the Gerstman Non-Compete Agreement.  *See* Ex. B, § 9(h).

273.     To redress the Defendants' breaches and unlawful conduct, Plaintiffs bring these claims for damages and injunctive relief.

### COUNT I – BREACH OF CONTRACT
**(Asset Purchase Agreement)**
**(Against All Defendants)**

274.     Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 to 273 as if set forth herein.

275.     The Asset Purchase Agreement is a valid contract.

276.     Plaintiffs have fully complied with and fulfilled their obligations under the Asset Purchase Agreement including by: (i) paying Gerstman and the Selling Parties approximately $21 million dollars; and (ii) fulfilling all of Plaintiffs' Closing Deliveries as defined under Section 4.5(b) in the Asset Purchase Agreement.

277.     Plaintiffs have fully complied with the indemnification procedure set forth in Article 8 of the Asset Purchase Agreement.

278.    The Selling Parties were obligated to comply with all terms, conditions, duties, obligations, representations, and warranties in the Asset Purchase Agreement.

279.    The Selling Parties made representations and warranties under the Asset Purchase Agreement in order to induce Plaintiffs to enter into the Asset Purchase Agreement and pay the Purchase Price.

280.    The Selling Parties breached the Asset Purchase Agreement as set forth in this Complaint, including by making misrepresentations and omissions before and during execution of the Asset Purchase Agreement.  These violations, intentional misrepresentations, and willful omissions include, but are not limited to, failing to reveal possible risks that employees with the highest level of access to the Acquired Assets would not work for or would leave their employment with the Plaintiffs, including risks that were explicitly discussed with Gerstman the weeks and days before the Closing Date, and misrepresentations and omissions regarding the security, protection, status, handling, possession, and integrity of the Acquired Assets, Intellectual Property, and Trade Secrets acquired by the Plaintiffs.

281.    The inaccuracies, misrepresentations, and willful omissions by the Selling Parties including as described in this Complaint belie the Selling Parties' representations and warranties, including, but not limited to, those outlined in Sections 5.8(a–b)(i)(m–n), 5.9(a–b), 5.10(b)(d)–(f)(i), 5.18(d)(ii) of the Asset Purchase Agreement, among other breaches.

282.    The Asset Purchase Agreement's terms expressly and impliedly require the Selling Parties, including Gerstman, to not disparage Plaintiffs or otherwise interfere with their business relations.

283.    Gerstman disparaged Plaintiffs to the Former Employees following the Closing Date, including to interfere with the Former Employees' Employment Agreements and

employment with Plaintiffs, sow doubt about Plaintiffs' business and operations, and to induce the Former Employees to leave their employment with Plaintiffs to join a competitor, One Source.

284.    As set forth in this Complaint, the Selling Parties also breached the Asset Purchase Agreement by failing or refusing to comply with their indemnification obligations to Plaintiffs under Article 8 of the Asset Purchase Agreement.

285.    Under Section 8.2 of the Asset Purchase Agreement, Gerstman and the Selling Parties agreed as follows:

> The Selling Parties, jointly and severally, shall indemnify, defend, and hold harmless Buyer and its Affiliates (the "Buyer Indemnified Parties") from and against, and will reimburse the Buyer Indemnified Parties the amount of, any Loss suffered, sustained, incurred, paid or required to be paid by any Buyer Indemnified Party that is based upon, arises out of, results from, or is related to:
> (a) any inaccuracy in or breach of, or any allegation of any third party that if true, would be an inaccuracy in or breach of, any representation or warranty made by any Selling Party in this Agreement or any Ancillary Agreement;
> (b) any breach of or failure of any Selling Party to perform any covenant or agreement to be performed by any Selling Party under this Agreement or any Ancillary Agreement, or any allegation by a third party that, if true, would constitute such a breach or failure…

Ex. A, § 8.2(a)-(b).

286.    The indemnity provision for breach of Ancillary Agreements under Section 8.2(b) extends these indemnity requirements to the term of those Ancillary Agreements.  In the case of the Gerstman Non-Compete Agreement, this extended these requirements to the Restricted Period applicable to Gerstman's confidentiality, non-competition, non-solicitation, non-interference, and non-disparagement obligations, which extend for at least five years from the Closing Date.

287.    Pursuant to the Asset Purchase Agreement, "Loss" or "Losses" means "any claim, expense, damage, liability, obligation, deficiency, penalty, fine, assessment, cost (including any opportunity cost) or loss (including attorney's fees and other costs and expenses incident to, and

amounts paid or required to be paid in settlement of, any Action, including Actions to enforce any indemnity obligation), whether or not involving a Third Party Claim." Ex. A, Exhibit A.

288.    As set forth in this Complaint, the Selling Parties made numerous breaches, misrepresentations, omissions, and other inaccurate representations related to the representations and warranties in the Asset Purchase Agreement.

289.    As set forth in this Complaint, the Selling Parties and Gerstman have committed numerous breaches and violations of the Asset Purchase Agreement and the Ancillary Agreements, including the Gerstman Non-Compete Agreement.

290.    Pursuant to the Asset Purchase Agreement, Plaintiffs are entitled to indemnification for all Losses based on, resulting, from arising out of, or related to the Selling Parties' and Gerstman's inaccuracies, misrepresentations and omissions related to the representations and warranties, and for all Losses based on, resulting from, arising out of, or related to the Selling Parties' and Gerstman's breaches and violations of the Asset Purchase Agreement and the Ancillary Agreements.

291.    Plaintiffs have demanded indemnification from the Selling Parties in accordance with the Asset Purchase Agreement, but the Selling Parties have refused to indemnify Plaintiffs in violation of the Asset Purchase Agreement.

292.    The Selling Parties' breaches of the Asset Purchase Agreement and Gerstman's breaches of the Asset Purchase Agreement and the Ancillary Agreements, including the Gerstman Non-Compete Agreement, harmed Plaintiffs, whose damages and Losses include, but are not limited to, the damages and costs incurred in relation to the Alabama Litigation, the costs of this litigation, the costs of entering the Asset Purchase Agreement, the costs of entering the Gerstman Non-Compete Agreement, the costs of entering the Employee Agreements, the costs of depriving

the Plaintiffs of the benefits of the Asset Purchase Agreement, the costs of depriving the Plaintiffs of the benefits of the Gerstman Non-Compete Agreement, the costs of depriving the Plaintiffs of the benefits of the Employment Agreements, the loss of valuable employees, the loss of or diminution in value in the Acquired Assets including, but not limited to, the Intellectual Property and Trade Secrets acquired by Plaintiffs pursuant to the Asset Purchase Agreement, loss of goodwill in the Plaintiffs' business, the costs of retaining and protecting Plaintiffs' employees and information, all other Losses the Selling Parties are required to indemnify the Plaintiffs for under the Asset Purchase Agreement and the Ancillary Agreements, other irreparable harm for which there is no legal remedy, and other damages to be proven at trial.

293.    Gerstman's wrongful and unlawful conduct, including his breaches and violations of the Asset Purchase Agreement, has and will continue to cause Plaintiffs to suffer irreparable harm which cannot be remedied by damages alone.

294.    Gerstman acknowledged and agreed that his actual or threatened breaches of the the Asset Purchase Agreement would cause Plaintiffs irreparable harm, thereby entitling Plaintiffs to injunctive relief.

295.    Accordingly, Plaintiffs are entitled to a permanent injunction enjoining Gerstman's violations of the Asset Purchase Agreement including, but not limited to, Gerstman's non-disparagement restrictions under the Asset Purchase Agreement.

### COUNT II – BREACH OF CONTRACT
### (Gerstman Non-Compete Agreement)
### (Against Gerstman)

296.    Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 to 295 as if set forth herein.

297.    The Gerstman Non-Compete Agreement is a valid contract.

298.    The non-compete, non-solicitation, and other restrictive covenants contained in the Non-Compete Agreement are reasonable in scope and enforceable.

299.    Gerstman received adequate consideration for entering the Gerstman Non-Compete Agreement.  Gerstman, through his companies, the Selling Parties, received the Purchase Price in exchange for entering into the Asset Purchase Agreement and the Ancillary Agreements, including the Gerstman Non-Compete Agreement.

300.    Gerstman agreed to enter into the Gerstman Non-Compete Agreement in connection with the Asset Purchase Agreement in order to induce Plaintiffs to pay the Purchase Price of approximately $21 Million to the Selling Parties.

301.    Plaintiffs have fully complied with the Gerstman Non-Compete Agreement.

302.    By signing the Non-Compete Agreement, Gerstman agreed that he would not compete with Plaintiffs or solicit or interfere with Plaintiffs' employment or business relationships, as set forth in the Non-Compete Agreement.

303.    Gerstman also agreed that he would maintain the confidentiality of, and not disclose Plaintiffs' confidential and proprietary information including, without limitation, the Acquired Assets the Defendants sold to Plaintiffs as part of the Acquisition.

304.    During the Restricted Period, Gerstman breached the Non-Compete Agreement by inducing, encouraging, and assisting the Former Employees to leave Plaintiffs and join a direct competitor, One Source, in violation of the Former Employee's restrictive covenants.

305.    During the Restricted Period, Gerstman breached the Non-Compete Agreement by collaborating, assisting, counseling, rendering advice to, and communicating with Plaintiff's competitor One Source, including advising One Source on growing its competitive business,

targeting and hiring away Plaintiffs' key managerial employees, disclosing protected information, and goodwill, and otherwise aiding and assisting One Source's business.

306.    During the Restricted Period, Gerstman breached the Non-Compete Agreement by collaborating, assisting, counseling, rendering advice to, and communicating with Shoemaker and Rollo regarding how to grow, improve, and operate One Source's business in competition with Plaintiffs, including by using information and experience developed at or belonging to Plaintiffs and/or information Gerstman sold to Plaintiffs through the Acquisition.

307.    During the Restricted Period, Gerstman breached the Non-Compete Agreement by collaborating with and assisting the Former Employees in their efforts to conceal their employment with One Source and the Former Employees' efforts to impede Plaintiffs' investigation and to otherwise avoid their Employment Agreements.

308.    During the Restricted Period, Gerstman breached the Non-Compete Agreement by disparaging Plaintiffs and their employees, directors, officers, and affiliates to the Former Employees and other third parties.

309.    During the Restricted Period, Gerstman breached the Non-Compete Agreement by voluntarily and affirmatively aiding Shoemaker and One Source in the Alabama Litigation, including in support of Shoemaker's and One Source's efforts to retain Plaintiffs' information and otherwise avoid Shoemaker's obligations to Plaintiffs in the Employment Agreement.

310.    During the Restricted Period, Gerstman breached the Non-Compete Agreement by failing to notify Plaintiffs regarding the disclosure of Plaintiffs' Confidential Information related to the Acquired Assets.

311.    As a result of Gerstman's wrongful conduct in breaching his confidentiality, non-competition, non-solicitation, and non-disparagement and other obligations to Plaintiffs, he has

damaged and will continue to damage Plaintiffs, including, but not limited to, loss of consideration paid to Gerstman for entering into the Gerstman Non-Compete Agreement and Asset Purchase Agreement; the costs of entering into the Asset Purchase Agreement and the Ancillary Agreements; loss of value of the Asset Purchase Agreement and the Ancillary Agreements; the costs of entering into the Employment Agreements with the Former Employees; loss of value of the Employment Agreements with the Former Employees; loss of and damage to Plaintiffs' valuable and confidential information; damage to Plaintiffs' relationships with its key employees; loss of use of Plaintiffs' key employees; Plaintiffs' costs associated with procuring, producing, developing, and protecting Plaintiffs' valuable information, including the Acquired Assets, Intellectual Property, and Trade Secrets acquired from Gerstman in the Acquisition; the costs of this litigation and the Alabama Litigation; all Losses under the Asset Purchase Agreement and the Ancillary Agreements stemming from or related to Gerstman's breaches; all other damages to be proven at trial, and other irreparable harm that cannot be remedied by monetary damages alone.

312.    Gerstman's wrongful and unlawful conduct, including his breaches and violations of the Gerstman Non-Compete Agreement, has and will continue to cause Plaintiffs to suffer irreparable harm which cannot be remedied by damages alone.

313.    Gerstman acknowledged and agreed that his actual or threatened breaches of the Gerstman Non-Compete Agreement would cause Plaintiffs irreparable harm, thereby entitling Plaintiffs to injunctive relief.

314.    Accordingly, Plaintiffs are entitled to a permanent injunction enjoining Gerstman's violations of the Gerstman Non-Compete Agreement including, but not limited to, Gerstman's violations of his non-compete, non-solicitation, and confidentiality restrictions under the Gerstman

Non-Compete Agreement in relation to One Source and the Former Employees, and Gerstman's non-disparagement restrictions under the Gerstman Non-Compete Agreement.

### COUNT III – TORTIOUS INTERFERENCE
### WITH CONTRACTUAL RELATIONS
**(Against Gerstman)**

315.     Plaintiffs repeat, reallege, and incorporate by reference the paragraphs 1 to 314 as if set forth herein.

316.     Shoemaker and Rollo each entered into the Employment Agreements with Plaintiffs.

317.     The Employment Agreements are valid and enforceable contracts, and Plaintiffs have fully complied with the Employment Agreements.

318.     Gerstman was aware of and on notice of the Former Employees' Employment Agreements with Plaintiffs, including the non-compete and non-solicitation covenants, confidentiality restrictions, and other obligations to Plaintiffs contained therein, since at least the March 27, 2023 Closing Date.

319.     Indeed, because Gerstman agreed to secure the Employment Agreements from his key employees, Shoemaker and Rollo, in conjunction with the Acquisition, Gerstman was specifically aware that the Former Employees had contracts with Plaintiffs that restricted their competitive activities and protected the confidentiality of Plaintiffs' confidential and trade secret information, including the Acquired Assets Gerstman sold to Plaintiffs.

320.     Gerstman was not a party to the Former Employees' Employment Agreements with the Plaintiffs.

321.    Gerstman wrongfully, intentionally, and unjustifiably interfered with the Employment Agreements by inducing and encouraging the Former Employees to leave their employment with Plaintiffs.

322.    Gerstman wrongfully, intentionally, and unjustifiably interfered with the Employment Agreements by inducing, assisting, advising, and encouraging the Former Employees to separate from Plaintiffs and begin working for Plaintiffs' competitor, One Source, in breach of the Employment Agreements, which in turn induced each of the Former Employees to use and disclose Plaintiffs' confidential information and trade secrets to One Source.

323.    Gerstman wrongfully, intentionally, and unjustifiably collaborated with One Source in targeting the Former Employees, and concurrently induced, encouraged, and assisted the Former Employees in their defection to One Source, because of the information the Former Employees possessed and had knowledge of regarding Plaintiffs' confidential information and trade secrets, including the Acquired Assets Gerstman sold to Plaintiffs.

324.    Gerstman wrongfully, intentionally, and unjustifiably interfered with the Former Employees' Employment Agreements by collaborating with, encouraging, directing, and assisting One Source in its solicitation, hiring, and employment of the Former Employees in violation of their Employment Agreements.

325.    Gerstman wrongfully, intentionally, and unjustifiably induced the Former Employees to breach their Employment Agreements by instructing and collaborating with the Former Employees on a scheme to circumvent the requirements of their Employment Agreements to benefit One Source.

326.    Gerstman wrongfully, intentionally, and unjustifiably induced Shoemaker to breach his Employment Agreement by instructing Shoemaker how he could help grow One Source's

competing business, including how Shoemaker could specifically use information regarding Plaintiffs' confidential Service Titan platform and instance to benefit One Source.

327.    The Former Employees did in fact breach their Employment Agreements, including by working for One Source during the Restricted Period in violation of their non-compete covenants, violating their non-solicitation covenants, and by improperly taking, retaining, disclosing, and using Plaintiffs' confidential and trade secret information in relation to One Source, including the Acquired Assets the Defendants sold to Plaintiffs, among other violations of the Employment Agreements.

328.    Plaintiffs have been harmed and will continue to suffer irreparable harm as a result of Gerstman's unlawful interference with their Employment Agreements and employment relationships with the Former Employees, including, but not limited to, the loss of Plaintiffs' valuable information, the loss of the benefit of Plaintiffs' Employment Agreements and the restrictive covenants contained therein, the loss of use of its employees, damage to its employee relationships, loss of goodwill, the cost of protecting Plaintiffs' information, the costs of this litigation and of the Alabama Litigation, other damages to be proven at trial, and irreparable harm that cannot be remedied by monetary damages alone.

## COUNT IV – UNJUST ENRICHMENT
### (IN THE ALTERNATIVE TO COUNTS I & II)
#### (Against All Defendants)

329.    Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 to 328 as if set forth herein.

330.    Plaintiffs allege the claims under Count IV in the alternative to Counts I and II.

331.    The Selling Parties made representations and warranties to Plaintiffs under the Asset Purchase Agreement in order to induce Plaintiffs to enter into the Asset Purchase Agreement and pay the Purchase Price.

332.    The Selling Parties made material misrepresentations and willful omissions in relation to the representations and warranties, and engaged in other wrongful and unlawful conduct before the Closing Date in order to induce the Plaintiffs to enter into the Asset Purchase Agreement and the Ancillary Agreements and to pay the Purchase Price to the Selling Parties, including Gerstman.

333.    The Selling Parties knew and understood that the Plaintiffs relied upon the Selling Parties representations and warranties and that the Plaintiffs expected the Selling Parties to comply with and abide by the Asset Purchase Agreement and the Ancillary Agreements.

334.    The Selling Parties have retained the Purchase Price despite their wrongful and unlawful conduct.

335.    In the event that the Court determines that the terms and provisions of the Asset Purchase Agreement are inapplicable, invalid, or otherwise not enforceable, then by the Selling Parties' wrongful acts, as set forth in this Complaint, the Selling Parties were unjustly enriched by accepting and retaining the Purchase Price for entering into the Asset Purchase Agreement and the Ancillary Agreements with the Plaintiffs, with which the Selling Parties did not comply, undermined, and deprived Plaintiffs the benefits of, both before and after the Closing Date.

336.    Further, the Selling Parties sold Plaintiffs certain Acquired Assets, including Intellectual Property and Trade Secrets that, according to sworn testimony by the Selling Parties' Principal and owner Gerstman, the Selling Parties did not properly maintain, protect, possess, or control, which the Selling Parties permitted their employees to take, possess, disseminate and

retain, and which the Plaintiffs paid the Selling Parties a significant portion of the Purchase Price to acquire.

337.    If the Court in the Alabama Litigation, or any other court, determines that Plaintiffs cannot protect the Acquired Assets, enforce any related contractual, statutory, or common law rights related to the Acquired Assets, or that the Acquired Assets are devalued, valueless, or otherwise no longer confidential or protectible, because of the Selling Parties' actions or inactions, the Plaintiffs will have been deprived of all value and consideration paid to the Selling Parties in exchange for the Acquired Assets. The Selling Parties will therefore be unjustly enriched by receiving and retaining any portion of the Purchase Price related to or allocated to the Acquired Assets, Intellectual Property, and Trade Secrets sold to the Plaintiffs.

338.    Plaintiffs paid good and valuable consideration to Gerstman in exchange for his agreement to and ongoing compliance with the Gerstman Non-Compete Agreement.

339.    Gerstman accepted and retained all consideration paid by Plaintiffs.

340.    Gerstman failed to comply with the Gerstman Non-Compete Agreement, including his numerous breaches and violations set forth in this Complaint.

341.    Notwithstanding Gerstman's failure to abide by the Gerstman Non-Compete Agreement, Gerstman has retained all consideration Plaintiffs paid to him.

342.    In the event that the Court determines that the terms and provisions of Gerstman Non-Compete Agreement are inapplicable, invalid, or otherwise not enforceable, then by his wrongful acts, as set forth in this Complaint, Gerstman was unjustly enriched by receiving and retaining compensation for entering into agreements with Plaintiffs with which he never intended to comply and did not comply.

## COUNT V –AIDING AND ABETTING BREACHES OF
## FIDUCIARY DUTY
### (Against Gerstman)

343.    Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 to 342 as if set forth herein.

344.    During all acts pertinent to this claim, Gerstman, understood that each of the Former Employees owed fiduciary duties to Plaintiffs.

345.    Gerstman understood that Plaintiffs entrusted the Former Employees with key managerial and decision-making responsibilities, and with access to Plaintiffs' most sensitive confidential and strategic information, including the very Acquired Assets, Intellectual Property, and Trade Secrets Gerstman sold to Plaintiffs.

346.    Gerstman was acutely aware of each of the Former Employees' managerial roles and fiduciary obligations, in part, because each of the Former Employees served in the same role or similar roles for Gerstman and his companies before the Acquisition.

347.    Gerstman aided and abetted Shoemaker's breach of his fiduciary duties to Plaintiffs.

348.    As Plaintiffs' General Manager and key managerial employee through his September 30, 2023 separation, Shoemaker occupied a position of trust and confidence, and owed the Plaintiffs duties of loyalty and care, among other obligations.

349.    Shoemaker also owed contractual duties to Plaintiffs to protect the confidentiality of Plaintiffs' information, present all potential or actual corporate opportunities to Plaintiffs, raise all actual or potential conflicts of interest with Plaintiffs, not use Plaintiffs' resources in a way that conflicts with Plaintiffs' business interests, to not solicit Plaintiffs employees or otherwise interfere with their employment, and to not disparage Plaintiffs.

350.    Gerstman understood Shoemaker's fiduciary position, role, and duties with Plaintiffs.

351.    Gerstman further understood Shoemaker's contractual obligations and duties to Plaintiffs under the Employment Agreement, which Gerstman has been on notice of since at least the March 27, 2023 Closing Date.

352.    While Shoemaker was Plaintiffs' fiduciary and managerial employee, Gerstman aided and abetted Shoemaker's breach of his fiduciary duties to Plaintiffs including by assisting and encouraging him to engage in surreptitious meetings and communications with One Source about growing and improving One Source's competing business and expanding One Source's competing territory, inducing Shoemaker to directly and indirectly to unlawfully access, use, and misappropriate Plaintiffs' resources and information, instructing Shoemaker how he could help grow One Source's competing business, including how Shoemaker could specifically use information regarding Plaintiffs' confidential Service Titan platform and instance to benefit One Source with knowledge that Shoemaker was responsible for running and operating Service Titan at Plaintiffs and had unfettered access to Plaintiffs' confidential Service Titan information, inducing Shoemaker to communicate with Plaintiffs' other employees about separating from Plaintiffs and joining One Source, inducing, assisting, and encouraging Shoemaker to avoid his Employment Agreement and obligations to Plaintiffs, and collaborating with and inducing Shoemaker to join in a scheme to avoid detection by Plaintiffs, and actively directing others to do the same.

353.    These actions, among others, constituted a clear breach of Shoemaker's duties of loyalty and care to Plaintiffs, in addition to Shoemaker's contractual duties, because they, *inter*

*alia*, conflicted with Plaintiffs' interests and Shoemaker's obligation to act for Plaintiffs' sole benefit.

354.    Shoemaker's actions, which Gerstman aided and abetted, substantially damaged and irreparably harmed Plaintiffs, including the loss of resources, such as Shoemaker's own paid time, loss of corporate opportunities, loss of use of employees, harm to Plaintiffs' competitive advantage, company goodwill, and market value, and loss of valuable confidential information, among other damages to be proven at trial.

355.    Gerstman also aided and abetted Rollo's breach of his fiduciary duties to Plaintiffs.

356.    Rollo was Plaintiffs' Sales Manager until August 7, 2023.  Rollo occupied a position of trust and confidence with Plaintiffs, and owed the Plaintiffs duties of loyalty and care, among other obligations.

357.    Rollo also owed contractual duties to Plaintiffs to protect the confidentiality of Plaintiffs' information, present all potential or actual corporate opportunities to Plaintiffs, raise all actual or potential conflicts of interest with Plaintiffs, not use Plaintiffs' resources in a way that conflicts with Plaintiffs' business interests, to not solicit Plaintiffs employees or otherwise interfere with their employment, and to not disparage Plaintiffs.

358.    Gerstman understood Rollo's fiduciary position, role, and duties with Plaintiffs.

359.    Gerstman further understood Rollo's contractual obligations and duties to Plaintiffs under the Employment Agreement, which Gerstman has been on notice of since at least the March 27, 2023 Closing Date.

360.    While Rollo was Plaintiffs' fiduciary and managerial employee, Gerstman aided and abetted Rollo's breaches including by assisting and encouraging him to engage in surreptitious meetings and communications with One Source, inducing him directly and indirectly to unlawfully

access, use, and misappropriate Plaintiffs' resources and information, inducing him to communicate with Plaintiffs' other employees about separating from Plaintiffs and joining One Source, inducing and encouraging him to avoid his Employment Agreement and obligations to Plaintiffs, and inducing him to join in a scheme to avoid detection by Plaintiffs, and actively directing others to do the same. Gerstman specifically collaborated with Rollo to conceal and evade any investigation and suspicion by Plaintiffs and to otherwise avoid Rollo's contractual obligations and duties to Plaintiffs.

361.    These actions, among others, constituted clear breaches of Rollo's duties of loyalty and care to Plaintiffs, in addition to Rollo's contractual duties, because they, *inter alia*, conflicted with Plaintiffs' interests and Rollo's obligation to act for Plaintiffs' sole benefit.

362.    Rollo's actions, which Gerstman aided and abetted, substantially damaged and irreparably harmed Plaintiffs, including the loss of resources, such as his own paid time, loss of corporate opportunities, loss of use of employees, harm to Plaintiffs' competitive advantage, company goodwill, and market value, and loss of valuable confidential information, among other damages to be proven at trial.

363.    Gerstman's actions aided and abetted Rollo and Shoemaker's breaches, thus causing the harm just described.

<u>**COUNT VI – FRAUD IN THE INDUCEMENT**</u>
**(Against All Defendants)**

364.    Plaintiffs' repeat, reallege, and incorporate by reference paragraphs 1 to 363 as if set forth herein.

365.    The Selling Parties had a duty to disclose certain material facts to Plaintiffs during the negotiations of, and consummation of, the Asset Purchase Agreement.

366.     The Selling Parties made representations and warranties in Asset Purchase Agreement in order to induce Plaintiffs to enter into the Asset Purchase Agreement and pay the Purchase Price of approximately $21 million to the Selling Parties.

367.     The Selling Parties, including Gerstman as the Selling Parties' Principal and signatory to the Asset Purchase Agreement, made affirmative and intentional misrepresentations and intentional omissions to Plaintiffs in relation the Asset Purchase Agreement including, but not limited to, (i) those facts recited in this Complaint; (ii) the fact that Gerstman had an ongoing business relationship and communications with competitor One Source and One Source's leadership; (iii) the fact that the Former Employees were dissatisfied with and opposed the Acquisition; (iv) the fact that the Former Employees informed Gerstman on multiple occasions, including in the weeks and even days before the Acquisition, that they planned to leave employment with Plaintiffs, were not committed to working for Plaintiffs, and/or were apprehensive about continuing to work for Plaintiffs post-Acquisition; and (v) according to Gerstman's sworn testimony in the Alabama Litigation, the fact that the Selling Parties failed to institute information security controls or measures, or properly possess, handle, treat, protect, or control the Acquired Assets, Intellectual Property, and Trade Secrets, and that the Selling Parties' permitted their employees to take, disseminate, retain, and possess the Acquired Assets, including the Intellectual Property and Trade Secrets acquired by Plaintiffs pursuant to the Acquisition.

368.     Before the Closing Date, the Selling Parties omitted or misrepresented these material facts, including through affirmative, contradictory representations and warranties to the Plaintiffs in the Asset Purchase Agreement, in order to induce Plaintiffs to enter into the Asset Purchase Agreement.

369.     The Selling Parties made these statements, representations, and omissions with the intent to induce Plaintiffs to act or refrain from acting, including, but not limited to, inducing the Plaintiffs to enter into the Asset Purchase Agreement, inducing the Plaintiffs to refrain from abandoning negotiations with the Selling Parties, renegotiating the terms of the Asset Purchase Agreement and/or the Purchase Price, or implementing additional safeguards for Gerstman and the Former Employees with their existing fiduciary, contractual, and other duties to Plaintiffs.

370.     If Plaintiffs were aware of the facts that the Selling Parties misrepresented or omitted before the Acquisition, Plaintiffs would have immediately abandoned their negotiations with the Selling Parties and pursuit of the Acquisition, and would not have entered into the Asset Purchase Agreement.

371.     The Selling Parties knew certain representations and warranties were false or, at the very least, material omissions before entering into the Asset Purchase Agreement.

372.     The Selling Parties made these false statements, misrepresentations, and omissions, with the intention that Plaintiffs would proceed with the Asset Purchase Agreement and pay the Selling Parties the Purchase Price.

373.     Plaintiffs acted in justifiable reliance on the Selling Parties' acts, representations, and omissions, including in the representations and warranties of the Selling Parties, including of Gerstman, the owner and principal of the Selling Parties and the signatory to the Asset Purchase Agreement.

374.     Section 8.11 of the Asset Purchase Agreement confirms that "nothing in this Agreement (including the limitations on indemnification set forth in this Article 8) shall operate to limit the liability of the Selling Parties for any Losses arising from, based upon or with respect

to fraud, all of which such Losses shall be indemnified by the Selling Parties jointly and severally without limitation."

375.    As a result of the Selling Parties' fraudulent inducement of Plaintiffs to enter into the Asset Purchase Agreement and pay the Selling Parties the Purchase Price, Plaintiffs have suffered and continue to suffer damages, including, but not limited to, loss of the value of their investment and related goodwill, the value of the Asset Purchase Agreement and the Ancillary Agreements, the loss of value of the Employment Agreements and loss of their key employees, the loss or diminution in value of the Acquired Assets, Intellectual Property and Trade Secrets Plaintiffs purchased in the Acquisition, costs and fees incurred in relation to the Alabama Litigation and this litigation, and other damages to be proven at trial.

<u>**COUNT VII – FRAUDULENT CONCEALMENT**</u>
**(Against All Defendants)**

376.    Plaintiffs repeat, realleges, and incorporates by reference paragraphs 1 to 375 as if set forth herein.

377.    As set forth in this Complaint, the Selling Parties intentionally and deliberately concealed material facts and circumstances from Plaintiffs with knowledge (scienter) that concealing these matters was wrong and deceptive, including the following:

- In the final weeks and even days before Closing Date, Rollo and Shoemaker expressed repeated concerns and dissatisfaction with the Acquisition to Gerstman;

- In the final weeks and even days before the Closing Date, Rollo and Shoemaker told Gerstman and Gerstman knew that the Former Employees were uncertain if they would work for Plaintiffs for any period or at all;

- Gerstman had an ongoing business relationship and communications with Plaintiffs' competitor, One Source (including One Source's leadership and owners), who, with Gerstman's advice, counsel, and assistance, later raided Plaintiffs' key employees, hired Plaintiffs' key employees in violation of their restrictive covenants with Plaintiffs, and misappropriated Plaintiffs' information to unlawfully compete with Plaintiffs – all while Gerstman continued his undisclosed relationship with One Source;

- According to Gerstman's subsequent sworn testimony in the Alabama Litigation, that the Selling Parties did not maintain any information security controls or measures, or have or maintain possession or proper handling, treatment, protection or control of the Acquired Assets, Intellectual Property, and Trade Secrets acquired by Plaintiffs; and

- According to Gerstman's subsequent sworn testimony in the Alabama Litigation, that the Selling Parties permitted their employees, including Shoemaker, to take, disseminate, retain, and possess the Acquired Assets, including the Intellectual Property and Trade Secrets acquired by Plaintiffs pursuant to the Acquisition.

378.   The Selling Parties had a duty to reveal these matters prior to executing the Asset Purchase Agreement because these matters contradicted or undermined the Selling Parties' representations and warranties in the Asset Purchase Agreement, which Plaintiffs relied upon in entering into the Asset Purchase Agreement and in paying the Purchase Price to the Selling Parties.

379.   Despite their obligations to disclose such information to Plaintiffs, the Selling Parties failed to do so.

380.   In fact, the Selling Parties not only failed to disclose this concealed information, but made affirmative, contradictory representations and warranties to the Plaintiffs in the Asset Purchase Agreement.

381.   Had Plaintiffs known of the information that the Selling Parties concealed from them, Plaintiffs would have immediately abandoned negotiations with the Selling Parties and would not have entered into the Asset Purchase Agreement.

382.   Section 8.11 of the Asset Purchase Agreement confirms that "nothing in this Agreement (including the limitations on indemnification set forth in this Article 8) shall operate to limit the liability of the Selling Parties for any Losses arising from, based upon or with respect to fraud, all of which such Losses shall be indemnified by the Selling Parties jointly and severally without limitation."

383.   As a result of the Selling Parties' fraudulent concealment, Plaintiffs have suffered and continues to suffer damages, including, but not limited to, loss of the value of their investment

and related goodwill, the loss of value of the Asset Purchase Agreement and the Ancillary Agreements, the loss of value of the Employment Agreements and loss of their key employees, the loss or diminution in value of the Acquired Assets, Intellectual Property, and Trade Secrets Plaintiffs purchased in the Acquisition, costs and fees incurred in relation to the Alabama Litigation and this litigation, and other damages to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests that this Court:

A.      Enter a permanent injunction, ordering Gerstman to:

(i)      Cease and desist from acting in concert with, engaging in, inducing, encouraging, or assisting in the Former Employees' violations and breaches of their Employment Agreements with Plaintiffs;

(ii)     Cease and desist from violating his obligations to Plaintiffs under the Gerstman Non-Compete Agreement including, but not limited to, the non-compete, non-solicitation, and confidentiality restrictions thereunder;

(iii)    Cease and desist from collaborating with, assisting, rendering advice to, or communicating with the Former Employees or One Source in violation of the Asset Purchase Agreement and/or the Gerstman Non-Compete Agreement;

(iv)     Cease and desist from directly or indirectly using or disclosing Plaintiffs' confidential and proprietary trade secret information in relation to One Source, the Former Employees, or otherwise; and

(v)     Extending the restricted period of the covenants under Sections 4 and 5 of the Gerstman Non-Compete Agreement for any period Gerstman is found to have been in violation of such covenants;

B.     Enter a permanent injunction ordering the Selling Parties and Gerstman to indemnify Plaintiffs for all Losses arising out of or related to (i) the Selling Parties' and/or Gerstman's breaches of the Asset Purchase Agreement and the Ancillary Agreements and/or (ii) the Selling Parties' inaccuracies, misrepresentations or omissions in the Asset Purchase Agreement or the Ancillary Agreements, including an order directing the Selling Parties to immediately indemnify and reimburse Plaintiffs for all costs, attorneys fees, and other Losses already incurred and that are subsequently incurred in this litigation, the Alabama Litigation, and any other related litigation or action until all such disputes are finally and full resolved on the merits;

C.     Enter judgment against the Selling Parties and Gerstman and in favor of Plaintiffs on all Counts;

D.     Award Plaintiffs all compensatory, special, consequential, treble, punitive, or other damages available under Plaintiffs' agreements with the Defendants and applicable law;

E.     Award Plaintiffs indemnification and all related damages and Losses pursuant to the Asset Purchase Agreement;

F.     Award Plaintiffs pre- and post-judgment interest;

G.     Award Plaintiffs their costs and reasonable attorneys' fees; and

H.     Award such other and further relief as the Court may find just and proper under the circumstances.

OF COUNSEL:

Robert O. Sheridan
Matthew T. Brown
NELSON MULLINS RILEY &
SCARBOROUGH LLP
One Financial Center, Suite 3500
Boston, Massachusetts 02111
617-217-4700 – Telephone
617-217-4710 – Facsimile
robert.sheridan@nelsonmullins.com
matthew.brown@nelsonmullins.com


Dated:  September 24, 2024

POTTER ANDERSON & CORROON LLP

By: /s/ *John A. Sensing*
    John A. Sensing (No. 5232)
    Maame N. Boateng (No. 7020)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE 19801
    302-984-6000 – Telephone
    302-658-1192 – Facsimile
    jsensing@potteranderson.com
    mboateng@potteranderson.com

*Attorneys for Plaintiffs SA&H Alabama
Holdings, LLC and Southern HVAC
Corporation*